188 F.3d 1105 (9th Cir. 1999)
 HAROLD BIBEAU; MELANIE ANN DOOYEN BIBEAU, on their own and as Representatives of Classes of Similarly Situated Persons, Plaintiffs-Appellants,
v.
PACIFIC NORTHWEST RESEARCH FOUNDATION INCORPORATED, a Washington corporation; BATTELLE PACIFIC NORTHWEST LABORATORIES; BATTELLE MEMORIAL INSTITUTE, INCORPORATED, an Ohio Corporation; MAVIS ROWLEY; DANIEL DIIACONI, Doctor in his Individual and Former Official Capacity; FERNANDO LEON, Doctor in his Individual and Former Official Capacity; ROBERT E. WILDMAN, in His Individual and Former Official Capacity; JOHN RANDOLPH TOTTER, in His Individual and Former Official Capacity; JAMES LESLIE LIVERMAN, in His Individual and Former Official Capacity; UNITED STATES OF AMERICA, Defendants-Appellees.
 No. 97-35825
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued September 15, 1998
Submission Deferred September 16, 1998
Submitted September 28, 1998 Portland, Oregon
Decided August 19, 1999
 
 NOTE: SEE ORDER AT 208 F.3d 831.
 Stanley B. Siegel and Eric L. Cramer, Berger & Montague, Philadelphia, Pennsylvania, for the plaintiffs-appellants.
 Robert L. Aldisert, Perkins Coie, Portland, Oregon, for defendants-appellees Pacific Northwest Research Foundation and Mavis Rowley.
 Richard Montague, United States Department of Justice, Washington D.C., fordefendants-appellees United States, John Randolph Totter and James L. Liverman.
 Lisa E. Lear, Bullivant Houser Bailey, Portland, Oregon, for defendant-appellee Daniel DiIaconi.
 Appeal from the United States District Court for the District of Oregon; Michael R. Hogan, District Judge, Presiding. D.C. No. CV-95-06410-MRH.
 Before: J. Clifford Wallace and Alex Kozinski, Circuit Judges, and David Alan Ezra,* District Judge.
 Opinion by Judge Kozinski; Concurrence by Judge Wallace
 KOZINSKI, Circuit Judge:
 
 
 1
 More than thirty years ago, plaintiff Harold Bibeau suffered the unkindest cut of all. Today, he seeks to bring suit against those he claims are responsible for injuring him. The defendants parry by raising the statute of limitations. The district court agreed and entered summary judgment in favor of all defendants. See Bibeau v. Pacific Northwest Research Found., Inc., 980 F. Supp. 349, 358 (D. Or. 1997). We must decide whether Bibeau was or should have been aware of his injuries, and is therefore barred from bringing suit as a matter of law.
 
 
 2
 * In the 1960s, Bibeau was an inmate at the Oregon State Penitentiary (OSP). During that time, Dr. Carl Heller of the Pacific Northwest Research Foundation conducted a series of experiments, under the auspices of the Atomic Energy Commission, in order to determine the human body's responses to various experimental regimens, among them the effect of radiation on human testicular function. Inmates were paid for participating and proselytized other inmates to sign up for the experiments. As a result of this encouragement, Bibeau volunteered for the testicular irradiation experiments.
 
 
 3
 Bibeau's involvement with the Heller Experiments consisted of four steps: First, a biopsy was taken of his testicles prior to undergoing irradiation. Next, his testicles were exposed to approximately 18.5 rads of radiation. Biopsies were then periodically taken from his testicles in order to monitor the effects of the radiation. Finally, prior to his departure from the OSP, and in accordance with a consent form he had signed prior to his participation in the experiments, he underwent a vasectomy in order to prevent contamination of the genetic pool by mutated chromosomes.
 
 
 4
 Following his release from the OSP, Bibeau became a self described drifter, moving from place to place and spending many years as a long-haul truck driver. After marrying and settling near Portland, Bibeau lived a relatively peaceful life, not thinking about his time in the OSP. One day in 1993, he came across a news report of a speech by Energy Secretary Hazel O'Leary, which contained an apology from the United States government for its use of human subjects during the Cold War era. Bibeau thought the events she described sounded suspiciously similar to the program he had been involved in, and so he began an "obsessive" search for the truth about the Heller Experiments. Just short of two years after the O'Leary speech, Bibeau filed this action in the District of Oregon as the putative representative of a class of persons similarly situated. After Bibeau's claims were narrowed on a motion to dismiss, the court found that all of his claims were barred by the statute of limitations and granted the defendants' motions for summary judgment. See Bibeau, 980 F. Supp. at 358.
 
 II
 
 5
 Bibeau claims he was the victim of a conspiracy to fraudulently induce him to participate in the experiments, and that he was lied to about the possible side effects of the radiation and about the nature and purpose of the experiments. He also brings related state-law claims for fraud, battery, breach of fiduciary duty, strict liability for ultra hazardous activity and intentional infliction of emotional distress. These claims[1] have their roots in the events of over three decades ago, and the parties agree that the statute of limitations applicable to both the federal and the state claims is two years. See Wilson v. Garcia, 471 U.S. 261, 276 (1985) (holding that the appropriate state statute of limitations to borrow for section 1983 actions is that for recovery of damages for personal injuries); Or. Rev. Stat. S 12.110 (1997). The question remains: Two years from when?
 
 
 6
 Because it is inequitable to bar someone who has no idea he has been harmed from seeking redress, the statute of limitations has generally been tolled by the "discovery rule." Under this rule, the statute only begins to run once a plaintiff has knowledge of the "critical facts" of his injury, which are "that he has been hurt and who has inflicted the injury." United States v. Kubrick, 444 U.S. 111, 122 (1979). In addition to being a rule of Oregon law, see, e.g. , Gaston v. Parsons, 864 P.2d 1319, 1323 (Or. 1994), the discovery rule has been observed as a matter of federal law, see Kubrick, 444 U.S. at 120.[2]
 
 
 7
 There is a twist to the discovery rule: The plaintiff must be diligent in discovering the critical facts. As a result, a plaintiff who did not actually know that his rights were violated will be barred from bringing his claim after the running of the statute of limitations, if he should have known in the exercise of due diligence. See Herrera-Diaz v. United States, 845 F.2d 1534, 1537 (9th Cir. 1988). But "what [a plaintiff] knew and when [he] knew it are questions of fact." Simmons v. United States, 805 F.2d 1363, 1368 (9th Cir. 1986). The district court held that Bibeau had failed to diligently investigate his symptoms; as a result he had run out of time to file suit. Notably, however, the district court did not specify when Bibeau was, or should have been, aware of the fact that he had been injured by the Heller Experiments. This is a telling point, for it highlights the fact-intensive nature of the issue the district court resolved in granting summary judgment.
 
 
 8
 In support of the district court's ruling, defendants contend that Bibeau's claims accrued when the pain he experienced during his biopsies was much more severe than he had been told to expect, which should have alerted him that Dr. Heller was lying. Although a jury might find that someone who experienced much greater pain than he had been told to expect should have begun to question the bona fides of the experiments, we cannot hold as a matter of law that a reasonable person would be put on notice of his claims by such an event. Pain is subjective and cannot be described in precise terms. Bibeau may well have believed that he was experiencing the degree of pain he had been told to expect, but had misunderstood how much that would be. Nor is it clear why pain during the biopsies should have alerted him to the long-term effects of the radiation, especially since the biopsies and the irradiation were distinct operations performed during the experiments.
 
 
 9
 Alternatively, defendants point to certain physical symptoms, which may or maynot have had their roots in the Heller Experiments, that Bibeau experienced over the course of the many years since he left the OSP. These ailments consisted of recurrent, severe testicular pain, which Bibeau has experienced since the 1970s; a periodic groin rash he suffered from the early 1970s; a wart on the inside of his left upper leg, which he discovered in 1979; and certain lymph node lumps that appeared on his arm and back in 1979. Despite suffering from these symptoms over the course of decades, Bibeau never consulted a doctor, nor did it cross his mind that they could be associated with the Heller Experiments. He claims that he believed some of these symptoms were common male complaints. The district court held, however, that a reasonable person "would have associated the pain with the experiments, accurately or not, or at least would have made inquiries regarding a possible connection." Bibeau, 980 F. Supp. at 355.
 
 
 10
 We cannot agree with the district court. A trier of fact could find that a reasonable person would not necessarily have connected Bibeau's symptoms to the Heller Experiments. It is a closer question whether the symptoms created a duty to consult a doctor. Under both federal and Oregon law, the question of diligence in cases like this is twofold. Initially, we must ask " `whether the plaintiff could reasonably have been expected to [consult a doctor] in the first place.' " Rosales v. United States, 824 F.2d 799, 804 (9th Cir. 1987), quoting In re Swine Flu Prods. Liab. Litig., 764 F.2d 637, 642 n.2 (9th Cir. 1985). If we answer this question in the affirmative, we must next determine whether a medical examination would have disclosed the nature and cause of plaintiff's injury so as to put him on notice of his claim. See Schiele v. Hobart Corp., 587 P.2d 1010, 1014 (Or. 1978); see also HerreraDiaz, 845 F.2d at 1537 (statute of limitations began to run when doctor identified cause of infant's cerebral palsy).
 
 
 11
 While we have held that the plaintiff has a duty of inquiry, see Rosales, 824 F.2d at 804, none of our cases deal with a situation where a plaintiff fails to seek medical attention that might have led him to discover his claim. In Schiele, however, the Oregon Supreme Court did deal with such a situation, and held that while "not everyone goes to a doctor with the same degree of alacrity," there is a point beyond which "delay in seeking medical attention is no longer reasonable," in which case plaintiff will be charged with "any knowledge which a medical examination would otherwise have disclosed." Schiele, 587 P.2d at 1014. Under Schiele, Bibeau may have hesitated too long in seeking medical attention, in which case he would be charged with whatever he would have learned from consulting a doctor. But it makes no difference in this case because the record fails to irrefutably demonstrate that, had Bibeau consulted a doctor, he would have discovered his claims.[3] In holding Bibeau's claim barred by the statute of limitations, the district court explained: "Given the plethora of information in the public domain regarding the risks of radiation exposure, generally, and the Heller experiments, specifically, had Bibeau explained his participation in the Experiments to a medical doctor , to the extent there is merit to his case, presumably he would have learned that there was a possibility that his symptoms were related to the Experiments." Bibeau, 980 F. Supp. at 355 (emphasis added). The district court's ruling presupposes that Bibeau not only would have seen a doctor about his symptoms, but also that he would have "explained[to him] his participation in the [Heller] Experiments." Id. But for Bibeau to have done so, he would have had to suspect a connection between the experiments and the symptoms, and we have already held that this is not necessarily the case. See p. 9434 supra. The question the district court should have addressed is whether, had Bibeau seen a doctor about his symptoms, the doctor would have discovered Bibeau's participation in the experiments and then made a connection between the two. The defendants did not submit any expert testimony or other evidence demonstrating that a normally competent doctor would have put Bibeau on the right track. With all that was in the public domain, it is possible that a competent doctor would have done so. But while we may determine what a "reasonable person" would do, we cannot, without any evidence in the record, say what a normally competent doctor would do in this situation. This genuine issue of material fact precluded summary judgment.
 
 
 12
 As a second justification for their insistence that Bibeau must have known he had been injured by the Heller Experiments, the defendants advance a litany of news reports and other public revelations regarding the OSP and the Heller Experiments. Indeed, the results of the experiments themselves were published in scientific journals, just as the inmates who participated in them were told they would be. Surely, the defendants contend, given the volume of public attention the experiments received, Bibeau cannot plausibly claim to have been unaware of the torts that he now alleges.
 
 
 13
 It is true that many news articles were published regarding the experiments, most notably around the time they ended and in the mid-1980s when the names of those involved were released. However, that doesn't mean that Bibeau must be lying about his ignorance, or that a reasonable man would necessarily have discovered the truth. The fact that Bibeau was employed as a long-haul trucker, and thus was often traveling around the country during the time that a rash of lawsuits over the Heller Experiments were filed in Oregon, would help explain why he didn't hear of the suits. He claims not to have been worried about the possible deleterious effects of radiation because his military experience led him to believe that radiation was safe. And, given his modest educational background, it is not entirely surprising that he wouldn't have come across any articles published in scientific journals. All of these factors and the inferences that can be drawn from them present questions of fact for a jury to resolve. Cf. Swine Flu, 764 F.2d at 641 (additional factfinding necessary to determine if general community awareness was sufficient to indicate that a plaintiff reasonably should have known of the cause of his wife's death).
 
 
 14
 We also reject the argument that Bibeau must be presumed to have known that he was injured as of 1987, when the Oregon legislature passed a bill providing for payment of medical expenses of inmates who participated in the Heller Experiments. Defendants rely on the adage that everyone is presumed to know the law, but that is actually a misstatement of the rule. What the law presumes is that everyone is aware of the obligations the law imposes on them. When a piece of legislation--usually of a criminal nature--adjusts the legal responsibilities of citizens, they cannot escape the effect of that law by claiming ignorance. Were the rule otherwise, citizens could frustrate the legislature's exercise of authority by an ostrich-like effort not to learn their legal obligations.[4] But that is very different from saying that every citizen is presumed to know every word of every law passed by the legislature. The 1987 Oregon statute imposed no obligations on Bibeau. On the contrary, the law imposed obligations on others to provide Bibeau with certain benefits. It was their responsibility to notify him of his rights, a responsibility they undertook only halfheartedly.
 
 
 15
 For much the same reasons, we cannot hold that Bibeau should be presumed to be aware of a 1986 report issued by the United States House of Representatives. It would stretch the rule that individuals are presumed to know their legal obligations to the breaking point to presume that they are aware of every report, white paper and floor statement delivered within the halls of the legislature. The legislative report, like the 1987 Oregon legislation, may have given Bibeau actual notice, in which case he would be barred. But Bibeau claims that he was unaware of either, and therefore his state of awareness is a contested question of fact that cannot be resolved on summary judgment.
 
 
 16
 In sum, although we sympathize with the view that there is a time when stale claims must come to rest and a defendant's right to repose outweighs a plaintiff's right to redress, we are unable to say that the time has come to declare Bibeau's claims to be barred as a matter of law.
 
 III
 
 17
 Many of the defendants also assert that they are shielded from the federal claims by the doctrine of qualified immunity. We conclude that some of them are.[5]
 
 
 18
 Both the Pacific Northwest Research Foundation (PNRF) and Mavis Rowley (who was Dr. Heller's assistant) contend that as government contractors that did not violate any clearly established constitutional rights, they are entitled to qualified immunity. According to them, recent Supreme Court decisions, such as Richardson v. McKnight, 521 U.S. 399 (1997), and Wyatt v. Cole, 504 U.S. 158 (1992), "strongly impl[y]" that private entities briefly associated with the government are entitled to share in governmental qualified immunity. It is true that in Richardson, the Supreme Court, although refusing to grant the defendant prison contractors qualified immunity, "answered the immunity question narrowly, in the context in which it arose," Richardson, 521 U.S. at 413, and also refused to rule on whether the defendants might assert "a special `good faith' defense, " id. However, circuit precedent suggests that the private defendants are not entitled to qualified immunity here. See Halvorsen v. Baird, 146 F.3d 680, 686 (9th Cir. 1998)(determining that "a firm systematically organized to assume a major lengthy administrative task" was not entitled to share in governmental qualified immunity). Our situation is little different from those in past cases that found qualified immunity absent. This isn't a firm that was "briefly associated with a government body," Richardson, 521 U.S. at 413, but rather a firm that conducted research at the OSP for a decade, from 1963 to 1973. We can find no principled distinction between private researchers such as the PNRF, the private prison guards involved in Richardson and the private detoxification facility in Halvorsen. Accordingly, PNRF and Rowley are not entitled to qualified immunity.
 
 
 19
 DiIaconi, who was the Chief Medical Officer at the OSP during the time in question, claims he is entitled to qualified immunity as a state employee who acted in good faith and did not violate any clearly established rights. Bibeau counters that DiIaconi violated his "clearly established constitutional right to be free from the non-consensual, non-therapeutic invasion of [his] bodily integrity." He claims to have met his burden of pointing to clearly established law existing at the time of the events by citing decisions such as Rochin v. California, 342 U.S. 165 (1952), and Skinner v. Oklahoma, 316 U.S. 535 (1942). This claim is problematic because those cases refer to the right at a high level of generality, and the Supreme Court has instructed that "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987). A right to bodily integrity defined only by these cases could leave a reasonable governmental official in doubt whether any battery would lead to a constitutional violation. But we need not decide whether these cases clearly establish a right to bodily integrity, as we hold that DiIaconi's actions here did not violate any such right, even if it was clearly established.[6]
 
 
 20
 Once the relevant right is identified, the question becomes whether a reasonable officer could have believed that his actions affecting that right were lawful. See Sinaloa Lake Owners Ass'n v. City of Simi Valley, 70 F.3d 1095, 1099 (9th Cir. 1995). "An official is entitled to qualified immunity even where reasonable officers could disagree as to the lawfulness of the official's conduct, so long as that conclusion is objectively reasonable." Id. Even assuming that Bibeau had a clearly established right to bodily integrity requiring that he be fully informed of all known risks of the experiments he had agreed to undergo, DiIaconi denies he was involved in the allegedly flawed process of obtaining consent. Instead of coming forward with evidence to suggest otherwise, Bibeau points to DiIaconi's position as Chief Medical Officer at the prison and the fact that he performed biopsies and vasectomies on inmates, including on Bibeau himself. But DiIaconi performed those operations pursuant to signed consent forms obtained by the experimenters, which he could have reasonably taken to indicate that the inmates had been informed of all the risks of the experiments. Bibeau has alleged that DiIaconi was convinced of "the worth of the program " (according to a report he coauthored after the experiments were conducted), but a belief that the program was worthwhile implies nothing about his knowledge as to the adequacy of the notice given the inmates. Indeed, Bibeau admitted in his deposition that the reason he included DiIaconi in this suit was because he "assume[d]" and "believe[d] " that DiIaconi was involved with Dr. Heller and attended many of Dr. Heller's meetings, and that there was no other reason that he was named in this litigation. A reasonable doctor could have believed that he was respecting the inmates' clearly established rights when he operated on them pursuant to seemingly valid consent forms.
 
 
 21
 Bibeau also complains that DiIaconi failed to advise former inmates that they should receive follow-up examinations as a result of the experiments, even though he considered his duty to his patients as a continuing one. Assuming such a failure would be actionable under state tort law--and we express no view on the subject--a violation of a tort duty certainly is not enough to show that DiIaconi violated clearly established constitutional rights. As the Supreme Court has said, qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). A reasonable doctor could have believed that operating on seemingly consenting patients and allowing the experiments to be conducted in the prison in which he worked was consistent with clearly established constitutional rights; therefore, we hold that DiIaconi is entitled to qualified immunity.
 
 
 22
 To resolve the question of Totter and Liverman's entitlement to qualified immunity, we enter into a murky area on the border between qualified immunity and liability under section 1983.[7] Generally, the key question to be answered for purposes of qualified immunity is whether the law was clearly established at the time of the alleged acts. Claims, such as Totter and Liverman's, that a defendant was not involved in the events giving rise to liability are cut from a different cloth, because they present factual disputes rather than distinct legal questions. See, e.g., Velasquez v. Senko, 813 F.2d 1509, 1511 (9th Cir. 1987). Although an officer not present at the scene of a beating obviously couldn't have violated any clearly established rights, such factual defenses are treated differently than claims based on the state of the law. As an example, an interlocutory appeal will not lie for such claims if the district court determines that there are genuine issues of fact involved. See Johnson v. Jones, 515 U.S. 304, 319-20 (1995). We need not worry about such jurisdictional considerations in evaluating these claims, however, as this is an appeal from a final judgment, not an interlocutory appeal. Therefore, we apply normal summary judgment principles to determine whether defendants are entitled to qualified immunity.
 
 
 23
 Like DiIaconi, Totter and Liverman don't dispute Bibeau's claim to a clearly established right to bodily integrity; rather, they argue that their actions did not violate Bibeau's rights. This resembles a claim that "a reasonable officer [could] have believed [his] conduct was lawful" in light of clearly established law, which is the second prong of our test for qualified immunity. Act Up!/Portland v. Bagley, 988 F.2d 868, 871 (9th Cir. 1993). At the same time, Totter and Liverman's defense also looks like they claim that section 1983 liability will not lie for the actions performed as a matter of section 1983 doctrine. Thus, it could very well be that what we have here aren't claims to qualified immunity so much as claims that section 1983 supplies no remedy for the acts alleged. We see these as flip sides of the same coin. Whether we denominate these assertions as claims of qualified immunity or claims that they are not subject to liability under section 1983 for their actions, the result is the same: Totter and Liverman were entitled to summary judgment on this point.
 
 
 24
 Aside from the fact that Totter and Liverman headed the Division of Biology and Medicine (Totter from 1967 to 1972 and Liverman from 1972 to 1979), Bibeau adduced no substantial connection between them and the Heller Experiments. Indeed, he forthrightly admitted that Totter and Liverman relied on the reports of their staff that the experiments were being conducted satisfactorily, although in doing so he added the legal conclusion that "Totter and Liverman as Directors were ultimately responsible for the Heller Experiments." Another way of phrasing Bibeau's "ultimate responsibility" theory is "respondeat superior," and such liability does not lie in either Bivens or section 1983 actions. See, e.g., Terrell v. Brewer, 935 F.2d 1015, 1018 (9th Cir. 1991) (Bivens); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989) (section 1983).
 
 
 25
 Bibeau attempts to avoid this bar by alleging that Totter and Liverman had sufficient involvement in the Heller Experiments to render them liable because they attended various meetings and reviewed certain proposals, but failed to take any steps to ensure that the inmates were properly informed. Even setting aside the fact that Liverman became head of the Division of Biology and Medicine after Bibeau had been released from the OSP, Bibeau has not adduced enough evidence to raise a genuine issue of material fact as to whether Totter and Liverman were more than peripherally connected with the Heller Experiments due to their alleged awareness of the project. This is further pointed up by the fact that Bibeau complains not about their actions, but about their inaction. Without more involvement in the experiments, they did not violate any of Bibeau's clearly established rights, and therefore are entitled to qualified immunity.
 
 
 26
 The defendants assert various other defenses, but we decline to consider their arguments because the discovery schedule indicates that the summary judgment motions were set only for questions relating to the statute of limitations and qualified immunity. Therefore, we will allow the district court to rule on these other contentions in the first instance.
 
 
 27
 The judgment of the district court is REVERSED , and this case is REMANDED for further proceedings consistent with this opinion.
 
 
 
 Notes:
 
 
 *
 The Honorable David Alan Ezra, United States District Judge for the District of Hawaii, sitting by designation.
 
 
 [1]
 The precise nature of the injuries Bibeau claims to have suffered is not clear. However, at one point he refers to an increased risk of cancer as his "key physical injury." We do not address whether this or any other harm Bibeau claims to have suffered amounts to a cognizable injury under Bibeau's various state and federal law theories.
 
 
 [2]
 Oregon law recognizes a third element to the discovery rule: that of "knowledge of the possibility of defendants'`tortious conduct.' " Doe v. American Red Cross, 910 P.2d 364, 370 (Or. 1996). In light of our resolution of Bibeau's claims, we need not consider what effect, if any, this third prong would have on his state law claims.
 
 
 [3]
 While "the extent to which a plaintiff used reasonable diligence is tested by an objective standard," we have held that in a fraud case, a "district court may . . . grant a summary judgment motion if the un-controverted evidence irrefutably demonstrates that a plaintiff discovered or should have discovered the fraud but failed to file a timely complaint." Volk v. D.A. Davidson & Co., 816 F.2d 1406, 1417 (9th Cir. 1987) (emphasis added). Not all of Bibeau's claims are for fraud, but his theory of the case is that the defendants fraudulently induced him to participate in the experiments. The "irrefutably demonstrates " standard therefore applies.
 
 
 [4]
 Cases in which the Oregon Supreme Court has invoked this adage do, indeed, all involve situations where the law in question imposed a specific obligation on the individual. For example, Dungey v. Fairview Farms, Inc., 290 P.2d 181 (Or. 1955), dealt with a driver knowing what a "residence district" was for purposes of the motor vehicle laws. See id. at 183-84. In Hood River County v. Dabney , 423 P.2d 954 (Or. 1967) (en banc), the court held that a statute of limitations that cut off the right to attack a foreclosure decree did not violate due process, even when the underlying foreclosure was defective. See id. at 960-61. But the court specifically noted that it was "not here dealing with a statute of limitations which cuts off the rights of the owner without warning." Id. at 961. Instead, the statute "specifically impress[ed ] upon the owner" the duty to investigate the tax status of the land. Id. That case thus represents an instance where the legislature adjusted the legal responsibilities of its citizens. We are aware of no cases from Oregon, or anywhere else, where the rule has been applied to situations where the law did not impose an obligation on the individual, and defendants have cited none.
 
 
 [5]
 Although the district court resolved the case on statute of limitations grounds and therefore didn't rule on qualified immunity, the issue was fully briefed below and in this court. As illustrated by the well established rule that we may affirm the district court's judgment on any basis supported by the record, see, e.g.,Blunk v. Arizona Dept. of Transp., 177 F.3d 879, 881 (9th Cir. 1999), it is sometimes appropriate for an appellate court to pass on issues of law that the trial court did not consider. The qualified immunity question presented here seems peculiarly suited for immediate resolution. Because qualified immunity presents a pure question of law which we review de novo, any decision by the district court would be entitled to no deference. Moreover, were the district court to deny qualified immunity to any of the defendants, the decision would be subject to an interlocutory appeal--adding unnecessary cost and delay. While we value the input of the district court whenever it is feasible to obtain it, in this case judicial economy favors an immediate decision of the qualified immunity question.
 
 
 [6]
 This case differs from In re Cincinnati Radiation Litig., 874 F. Supp. 796 (S.D. Ohio 1995), in a crucial way. The plaintiffs there alleged that the patients were never told they were part of an experiment but rather believed that they were receiving treatment for cancer. See id. at 802. Here, the inmates knew they were serving as experimental subjects rather than receiving treatment.
 
 
 [7]
 Although we speak only in terms of section 1983 here, the analysis is equally applicable to, and meant to include, analogous Bivens claims.
 
 
 WALLACE, Circuit Judge, concurring:
 
 28
 I concur in the majority's well-thought-out opinion, but I write separately because of the majority's determination to resolve the qualified immunity issues. I am inclined to agree with the substance of the majority's resolution, but I would not reach these issues for prudential reasons. Rather, I would remand to allow the district court to decide them in the first instance.
 
 
 29
 "It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below." Singleton v. Wulff, 428 U.S. 106, 120 (1976)."Certainly there are circumstances in which a federal appellate court is justified in resolving an issue not passed on below, as where the proper resolution is beyond any doubt . . . ." Id. at 121. It seems, however, that the appellate courts have sometimes forgotten that resolving issues not addressed by the district court is the exception, not the rule. Compare Weiser v. United States, 959 F.2d 146, 147 (9th Cir. 1992) (simply stating that "[o]ur review is not limited to a consideration of the grounds upon which the district court decided the issues"), with River City Markets, Inc. v. Fleming Foods West, Inc., 960 F.2d 1458, 1462 (9th Cir. 1992) (recognizing discretion and electing to decide issue). Here, the qualified immunity issues are complex, and it seems to me that, despite conjecture about possible efficiency gains, the "wiser course is to allow the district court to rule on [them] in the first instance." Barsten v. Department of the Interior, 896 F.2d 422, 424 (9th Cir. 1990); see also Schneider v. County of San Diego, 28 F.3d 89, 93 (9th Cir. 1994) (refusing to address qualified immunity arguments where district court granted summary judgment without reaching those issues).