Argued and submitted June 27, 2006, reversed and remanded January 31, 2007

## Akilah JOHNSON,
### *Plaintiff-Appellant,*

*v.*

## MULTNOMAH COUNTY
## DEPARTMENT OF COMMUNITY JUSTICE,
### *Defendant-Respondent,*

*and*

## DEPARTMENT OF CORRECTIONS,
### *Defendant.*

### Multnomah County Circuit Court
### 040606577; A128667

152 P3d 927

Kevin Tillson argued the cause for appellant. On the briefs were Brad A. Macomber and Hunt & Associates, PC.

Jacqueline A. Weber argued the cause for respondent. With her on the brief was Agnes Sowle, County Attorney for Multnomah County, Oregon.

Before Landau, Presiding Judge, and Schuman, Judge, and Rasmussen, Judge pro tempore.

SCHUMAN, J.

Rasmussen, J. pro tempore, concurring.

## SCHUMAN, J.

In 1997, when plaintiff was 14 years old, she was raped by a man named Ladon Stephens. At the time, Stephens was under the supervision of defendant, the Multnomah County Department of Community Justice. More than five years after the rape, plaintiff began this action by filing a tort claim notice. Defendant moved for summary judgment, arguing that plaintiff's action was barred because the notice was not timely. The trial court granted defendant's motion, and plaintiff appeals.[1] We reverse.

The parties agree that the notice deadline set out in ORS 30.275(2)(b) applies. Under that statute, plaintiff had to notify defendant of her impending claim "within 180 days after the alleged loss or injury." ORS 30.275 incorporates a so-called "discovery rule," *Dowers Farms v. Lake County*, 288 Or 669, 681, 607 P2d 1361 (1980), under which the 180-day period begins when

> "the plaintiff knows or, in the exercise of reasonable care should know, facts that would make an objectively reasonable person aware of a substantial possibility that all three of the following elements exist: an injury occurred, the injury harmed one or more of the plaintiff's legally protected interests, and the defendant is the responsible party. *Gaston v. Parsons*, 318 Or 247, 256, 864 P2d 1319 (1994); *Adams v. Oregon State Police*, 289 Or 233, 239, 611 P2d 1153 (1980). If the plaintiff's actual or imputed knowledge falls short of the quantum necessary to establish one of the elements but that knowledge should trigger a duty to pursue a further inquiry, then the relevant date for starting the statutory period is not when the plaintiff learns the necessary facts but when the inquiry that those facts should trigger would disclose the existence of the element. *Greene v. Legacy Emanuel Hospital*, 335 Or 115, 123, 60 P3d 535 (2002)."

*Benson v. State of Oregon*, 196 Or App 211, 215, 100 P3d 1097 (2004). The parties agree that plaintiff knew of the injury to a legally protected interest at the time of the rape; on summary

---

[1] Plaintiff also brought a claim against the Oregon Department of Corrections (DOC). That claim was dismissed, and DOC is not a respondent on appeal.

judgment, the dispositive question was when plaintiff knew or reasonably should have known of a substantial possibility that defendant was responsible for the injury. Plaintiff argued that she did not have that knowledge, and could not reasonably have had it, until December 2003 and that she filed her tort claim notice within 180 days (on April 28, 2004) as required by ORS 30.275(2)(b). Defendant argued, and the trial court agreed, that more than 180 days elapsed between the time plaintiff had or reasonably should have had the knowledge and the time she filed her notice.

■       In applying the discovery rule,

> "[p]recisely when a person reasonably should have known that the harm suffered was caused by another's negligence generally presents a question of fact. * * * Still, in some cases, the facts may be such that no triable issue exists as to when a plaintiff knew or should have known that the defendant caused the harm suffered, and, in those cases, the matter may be resolved as a matter of law. *Stevens* [*v. Bispham*, 316 Or 221, 228, 851 P2d 556 (1993)]."

*Hoeck v. Schwabe, Williamson & Wyatt*, 149 Or App 607, 612, 945 P2d 534 (1997). Thus, on appeal, the issue reduces to this: Reviewing the record in the light most favorable to plaintiff, ORCP 47 C, do the undisputed facts establish that every reasonable juror would have to find that, by October 28, 2003—180 days before she filed her tort claim notice— plaintiff either knew or reasonably should have known that there was a substantial possibility that defendant was responsible for that harm? We conclude that the facts do not compel that conclusion.

The following are the undisputed facts that are relevant to what plaintiff knew as of October 28, 2003. Plaintiff, as noted above, was assaulted and raped by Stephens in November 1997, when she was 14. Stephens at the time was under post-prison supervision (PPS) by defendant after having served six years' incarceration for three attempted kidnappings, but plaintiff did not know that at the time.

Over four years later, on April 29, 2002, Stephens was arrested on charges arising from another rape. DNA tests linked him to the rape of plaintiff and three other girls and to the highly publicized 2001 murder of a 14-year-old,

Melissa Bittler. Plaintiff was not informed of the link at that time.

Shortly thereafter, newspaper articles about Stephens's criminal history began to appear. The first of those, a May 30, 2002, article in the *Oregonian*, reported Stephens's arrest for the rape of a Portland woman and similarities to the rapes of other victims. The article contained details of the earlier rapes that matched details of plaintiff's rape, but the article did not mention plaintiff's name, nor did it report Stephens's supervision status. An *Oregonian* article published the following day disclosed that Stephens had "been under high-level supervision and undergoing sex offender treatment" before his most recent arrest. It quoted a Multnomah County Department of Community Justice spokesperson as stating, "[I]t is very difficult for the supervising officers to realize this killer was one of our individuals on parole." Again, the article did not mention plaintiff, nor did it indicate that Stephens was under supervision in 1997.

Information about Stephens's status as of 1997 came the following day. On June 1, 2002, the *Oregonian* reported on the front page of the local section that "Stephens has been on supervision since his December 1996 release from prison." On July 28, 2002, another *Oregonian* article reported that Stephens was paroled in 1996 and that he had failed polygraphs while under supervision.

Articles critical of defendant's supervision practices then began to appear. On December 7, 2002, the *Oregonian* published, on the front page and above the fold, an article devoted to the parole supervision problem and the management of Stephens's case. The article also featured a photo of Stephens. On December 11, 2002, *Willamette Week* named defendant on its weekly "Losers" list, stating, "Stephens is accused of raping * * * women while he was supposedly being supervised." On December 26, 2002, the *Oregonian* published an editorial on offender supervisors that faulted defendant for Stephens's continued criminal behavior.

On December 30, after all of those articles appeared, plaintiff began a period of incarceration that lasted until October 20, 2003. She was still incarcerated in May 2003,

when the Multnomah County District Attorney's office notified her that Stephens was her 1997 assailant, and in July 2003, when she was present during the hearings in Stephens's trial. And she was still incarcerated when the last news article in the record appeared on October 3, 2003—an *Oregonian* article dedicated entirely to Stephens's supervision, in which the father of Stephens's murder victim stated that he was considering legal action. That article appeared above the fold on the front page of the local section and featured a photo of Stephens.

Plaintiff asserts that she did not acquire actual knowledge that Stephens had been under defendant's supervision until December 2003, when her parents told her that defendant "had committed several errors while Ladon Stephens was on parole under its supervision" and that "several victims of Ladon Stephens had filed suits against Multnomah County." Defendant, for its part, counters that, by July 2003 at the latest—the date plaintiff was contacted by the Multnomah County District Attorney's office and asked to testify against Stephens—she knew facts that should reasonably have triggered an inquiry into defendant's role in her rape.

Defendant bases this assertion on two theories. It first points to the fact that one of Stephens's other 1997 victims filed a notice in August 2002 that she intended to bring an action against defendant. That argument cannot stand even cursory scrutiny. The other victim's tort claim notice did not allege any facts that were relevant to negligent supervision; its allegations were directed at the prosecutor and police. She wrote,

> "notice is hereby given of a claim under the provisions of the Oregon Tort Claims Act. [Victim] was raped and sexually assaulted by Ladon Andre Stephens on February 27, 1997, due to the County's failure to notify the public of Ladon Andre Stephens['s] prior rape and sexual assault on February 9, 1997 in the same area where [victim] was raped and sexually assaulted and the treatment, or lack thereof, of her report of sexual assault and rape."

Those allegations do not indicate that a reasonable person would be aware that defendant was responsible for supervising Stephens before any of the rapes. Indeed, the fact that the

second victim, who already had the assistance of an attorney, did *not* assert that defendant negligently supervised Stephens, could instead support the countervailing argument that, as of August 8, 2002, a reasonable person would *not* know of a substantial possibility that the county failed in its duty to supervise Stephens.

Defendant's stronger argument focuses on the newspaper articles and television news stories about the Bittler murder, in particular the coverage about Stephens's criminal history and his PPS status; according to defendant, that coverage was sufficient to alert plaintiff to facts establishing a substantial possibility that defendant was at fault. We disagree.

Although plaintiff testified at Stephens's trial that she knew that Stephens was her assailant "when he got arrested and it was in all the newspapers and stuff * * *," the record contains no direct evidence that plaintiff ever saw any of the media reports that Stephens was under defendant's supervision in 1997, when he attacked her. Because we view the record in the light most favorable to plaintiff, ORCP 47 C, we presume that plaintiff did not have actual knowledge of that fact. Defendant, however, maintains that plaintiff, in the exercise of reasonable care, should have become aware of a substantial possibility that defendant shared responsibility for her rape.[2]

As we have explained, when plaintiff in the reasonable exercise of care should have become aware of a substantial possibility that another is responsible for her injury is a question of fact that can be resolved against plaintiff on summary judgment only if plaintiff should have achieved that awareness as a matter of law—that is, only if every rational juror, asked whether plaintiff should reasonably have known

---

[2] Defendant also cites a number of Oregon statutes that allow newspaper publication to accomplish constructive notice. In the absence of any indication that the legislature contemplated the same type of notification for purposes of communicating a tortfeasor's role in causing harm to plaintiffs who would invoke the Oregon Tort Claims Act, we reject the argument that media publication of information relevant to plaintiff's injury put plaintiff on constructive notice of defendant's role in supervising Stephens.

by October 28, 2003, that defendant was probably responsible for her rape, would answer in the affirmative. On the record before us, we readily conclude that plaintiff's failure to see six newspaper articles (three of which were published while she was incarcerated) and a few television news broadcasts indicating that her attacker was under defendant's supervision was not unreasonable *as a matter of law.* Given her age, her circumstances, and any number of other facts that could be adduced at trial (circulation figures for the media outlets involved, plaintiff's educational background, etc.), a rational juror could easily conclude that plaintiff either should or should not reasonably have seen the relevant reports. That is a triable fact for the jury.

Although there are no Oregon cases that discuss the question whether a plaintiff, for purposes of the discovery rule, has an obligation to be aware of information in the media that is relevant to his or her potential tort claim, our conclusion finds support in *Bibeau v. Pacific Northwest Research Foundation, Inc.*, 188 F3d 1105 (9th Cir 1999). The issue in that case was whether the plaintiff was sufficiently diligent in discovering that the Oregon State Penitentiary might have been liable for injuries he incurred during scientific experiments conducted on him when he was an inmate. Applying its understanding of Oregon law, the court held,

> "As a second justification for their insistence that Bibeau must have known he had been injured by the Heller Experiments, the defendants advance a litany of news reports and other public revelations regarding the OSP and the Heller Experiments. * * * Surely, the defendants contend, given the volume of public attention the experiments received, Bibeau cannot plausibly claim to have been unaware of the torts that he now alleges.

> "It is true that many news articles were published regarding the experiments, most notably around the time they ended and in the mid-1980s when the names of those involved were released. However, that doesn't mean that Bibeau must be lying about his ignorance, or that a reasonable man would necessarily have discovered the truth. The fact that Bibeau was employed as a long-haul trucker, and thus was often traveling around the country during the time that a rash of lawsuits over the Heller Experiments were filed in Oregon, would help explain why he didn't hear

of the suits. He claims not to have been worried about the possible deleterious effects of radiation because his military experience led him to believe that radiation was safe. And, given his modest educational background, it is not entirely surprising that he wouldn't have come across any articles published in scientific journals. All of these factors and the inferences that can be drawn from them present questions of fact for a jury to resolve."

*Id.* at 1110. We find the court's reasoning to be persuasive and to be applicable to the present case.

Thus, the remaining question is whether there is a triable question whether the facts that plaintiff actually knew—in particular, that the man who raped her also committed several other rapes and a murder—should have led her to conduct an inquiry that, in turn, would have led her to discover defendant's role prior to October 28, 2003. Again, we conclude that, although a rational juror *could have* concluded that plaintiff's knowledge should have triggered further inquiry, a rational juror could have concluded otherwise. The fact that the person who committed a rape in 1997 was arrested for rape and murder in 2002 does not necessarily imply that the person was under defendant's supervision in 1997 or, for that matter, at any time.

*T. R. v. Boy Scouts of America*, 205 Or App 135, 133 P3d 353 (2006), and a case cited therein, *Plumeau v. School Dist. #40 County of Yamhill*, 130 F3d 432 (9th Cir 1997), provide instructive comparisons. In *Plumeau*, the Ninth Circuit held that the plaintiffs, parents of an abuse victim, had a duty to inquire into the identity of their child's abuser when the parents had knowledge that the sexual abuse had occurred, and that it occurred "during school hours and on school property and that the abuser was a school district employee." 130 F3d at 437. Those facts triggered the parents' duty to inquire into the possible role of the school district, as a matter of law, because they clearly indicated a relationship between the abuser and the defendant district. *T. R.*, 205 Or App at 142. In *T. R.* itself, the plaintiff had been abused by a city police officer, and he ultimately brought an action against the city. We held that the plaintiff's duty to inquire into the city's possible responsibility occurred at the time of the abuse, because, at that time, he knew that the officer

abused him while the officer was on duty as a city employee. *Id.* at 142-43. Thus, the duty to inquire into the possible role of the government defendant occurs when the plaintiff has facts that establish a connection between the person who actually and directly inflicts harm (here, Stephens) and the government defendant.

In the present case, a jury could find that plaintiff did not acquire that knowledge by virtue of her knowledge that Stephens had committed a murder and other rapes. Rather, she acquired it only when she learned that, at the time of the rape, Stephens was under the defendant's supervision. And as we discuss above, a triable issue remains as to whether she acquired that knowledge before October 28, 2003. We therefore reverse and remand.

Reversed and remanded.

**RASMUSSEN, J. pro tempore,** concurring.

In my view, the controlling issue in this case is whether or not plaintiff acquired information, prior to October 28, 2003, that would cause a reasonable person to inquire into whether defendant might be culpable for her injuries. With respect to the summary judgment standard, the facts that are material to plaintiff's duty to inquire are those that, if pursued, would tend to lead to the discovery of any causal relationship that may have existed between Stephens's rape of plaintiff and defendant's supervision of Stephens when the rape occurred. The information that was communicated to plaintiff by her parents in December 2003 regarding defendant's supervision of Stephens constitutes actual knowledge and is thus immaterial to the inquiry notice analysis. The inquiry notice standard would be eviscerated if plaintiff were required to possess actual knowledge as a predicate to her duty to inquire.

Although the facts relevant to inquiry notice should not and cannot be equated with the facts relevant to actual notice, on the evidence in this record, a rational juror could conclude that plaintiff lacked sufficient information to trigger a duty to inquire into the existence of any relationship between defendant and Stephens at the time of the rape.

Accordingly, I concur in the result reached by the majority in this case.