178 P.3d 210 (2008)
344 Or. 111
Akilah JOHNSON, Respondent on Review,
v.
MULTNOMAH COUNTY DEPARTMENT OF COMMUNITY JUSTICE, Petitioner on Review, and
Department of Corrections, Defendant.
(CC 0406-06577; CA A128667; SC S054697).
Supreme Court of Oregon, En Banc.
Argued and Submitted November 5, 2007.
Decided February 14, 2008.
Jacqueline A. Weber, Assistant County Attorney, Portland, argued the cause and filed the brief for petitioner on review. With her on the brief was Agnes Sowle, Attorney for Multnomah County.
Kevin J. Tillson, of Hunt & Associates, PC, Portland, argued the cause and filed the brief for respondent on review. With him on the brief was Lawrence B. Hunt.
Douglas G. Schaller, of Johnson, Clifton, Larson & Schaller, P.C., Eugene, filed a brief for amicus curiae Oregon Trial Lawyers Association.
GILLETTE, J.
This case is concerned with the so-called "discovery rule," as it applies to ORS 30.275(2)(b), a provision of the Oregon Tort Claim Act that requires any person bringing a tort claim against a public agency to give notice to the agency of the claim within 180 days of the alleged loss or injury.[1] Specifically, it asks whether, and to what extent, the appearance of newspaper articles in local papers suggesting that a public agency may have had a role in a plaintiff's injury should be deemed to put that plaintiff on notice of his or her claim against the public agency, and thus trigger the 180-day notice period. We do not reject the possibility that, in some circumstances, information appearing in such media reports may be imputed to a plaintiff as a matter of law. However, we conclude that, in the present case, reasonable jurors could disagree whether plaintiff should have learned about defendant's involvement in her injury from the stories that appeared in the local newspapers at the time that they appeared. The Court of Appeals reached the same conclusion, Johnson v. Mult. Co. Dept. Community Justice, 210 Or.App. 591, 152 P.3d 927 (2007), and we affirm its decision.
On November 5, 1997, when plaintiff was 14 years old, she was raped by an unknown assailant, who was identified, years later, as Ladon Stephens. Stephens had been released from prison about ten months before the rape, after serving six years for three separate attempts to kidnap young girls. At the time that Stephens raped plaintiff, he was being supervised as a high risk sex offender by the Multnomah County Department of Community Justice (defendant).
In April 2002, Stephens was arrested for the rape of another young woman. Shortly thereafter, the authorities connected Stephens to the November 5, 1997, rape of plaintiff by means of DNA evidence. Authorities also connected Stephens to two other rapes that occurred earlier in 1997 and, most notoriously, to the 2001 rape and murder of yet another young girl, Melissa Bittler. At some point thereafter, and at least by July 2003, plaintiff became aware that Stephens very likely had been her assailant.
In December 2003, plaintiff's parents told her that Stephens was being supervised by defendant when he raped her and that defendant's supervision of Stephens may have been inadequate. Well within 180 days of that conversation  on April 28, 2004  plaintiff gave notice to defendant that she had been injured as a result of its negligent supervision of Stephens and that she intended to file a civil action seeking damages. A few months later, plaintiff filed the action at issue here, alleging that defendant was negligent *212 in using parole officers who were not trained in sex offender management to supervise defendant; in failing to carry out all required home visits; in failing to act when polygraph tests and other evidence suggested that Stephens was being untruthful about his activities; in failing to act when Stephens missed scheduled appointments and examinations; and in sending Stephens for sex offender treatment to a psychologist who was not qualified to provide such treatment.
Defendant filed an answer, and then moved for summary judgment on the ground that plaintiff had failed to give notice of her claim within 180 days of her injury, as ORS 30.275(2)(b) requires. In its motion, defendant acknowledged that, under this court's cases, the notice period set out at ORS 30.275(2)(b) does not commence to run until the plaintiff has had a reasonable opportunity to discover his or her injury and the identity of the party responsible for that injury. See Adams v. Oregon State Police, 289 Or. 233, 239, 611 P.2d 1153 (1980) (so holding). Defendant noted, however, that that standard does not allow plaintiffs to ignore pertinent information but, instead, imputes to them the level of knowledge that a reasonable person would have had under the circumstances. Applying that standard to these circumstances, defendant argued, led inexorably to the conclusion that plaintiff's April 28, 2004, notice of claim was untimely: as a matter of law, defendant argued, a reasonable person in plaintiff's shoes would have learned about defendant's allegedly inadequate supervision of Stephens long before October 28, 2003 (180 days before April 28, 2004, when plaintiff gave notice of her claim to defendant).
In so arguing, defendant relied primarily on the fact that numerous articles about Stephens, his crimes, and his history with the county justice system had appeared in The Oregonian in 2002 and 2003. Defendant submitted eight of those articles with its summary judgment motion. The first article appeared on the front page of the Oregonian's May 30, 2002, edition  shortly after Stephens was arrested in April 2002  and stated that Stephens had been linked through DNA evidence to the 2001 rape and murder of Melissa Bittler and to three other rapes in 1997. The article described the date, location, and circumstances of each crime, but did not disclose the names of victims other than Bittler. The article noted that Stephens had been released from prison in 1996, but did not mention his parole status. Another similar article that appeared in the local section the next day (May 31, 2002) did mention that Stephens had been on high level supervision "until his April arrest."
The next article, which appeared in the local section of the paper on June 1, 2002, focused on attempts by Portland police to process a backlog of evidence collected in other rape cases. The article described how police had linked Stephens to earlier crimes, including a rape on November 5, 1997  the date on which plaintiff had been raped. The article noted that Stephens had been on supervision since his December 1996 release and described some of the terms of his supervision.
A third article, an editorial, appeared in the Sunday Oregonian on June 2, 2002. It argued for expanded DNA testing of convicted felons and described how DNA evidence had been used to link the Bittler murder to a rape that had occurred on November 5, 1997  again, a clear reference to the day on which plaintiff had been raped.
Thus far, however, no newspaper article had intimated that Stephens's freedom during the time period in question was attributable to any lack of care on defendant's part. An article that appeared in the local section on July 28, 2002, was the first to describe defendant's supervision of Stephens with any degree of detail. Toward the end of that article (which was devoted primarily to the inadequate investigation of Stephens's 1997 crimes by Multnomah County police), the author noted that Stephens committed his crimes while he was being supervised as a high risk sex offender by defendant. The article noted that Stephens had failed some polygraph tests, but then reported that defendant had "reviewed Stephens'[s] parole supervision and concluded that `procedures were followed.'"
Only three Oregonian articles that defendant submitted with its motion were directly *213 critical of defendant's supervision of Stephens. A December 7, 2002, article, entitled "Report Rips Parole Oversight of Suspect," reported the results of a Multnomah County internal review: Stephens's case had been passed among at least six different parole officers; not all of Stephens's parole officers had been trained in sex offender management; parole officers had failed to follow up when Stephens failed polygraph tests; and parole officers had not raised alarms when they could not contact Stephens at home. A December 26, 2002, editorial repeated much of the information contained in the December 7 article and then went on to call for "thorough soul-searching by the parole and probation department and a full public accounting early next year of everything that has changed, or is going to change as a result of this case." Finally, an October 3, 2003, article described changes that defendant had made in its procedures for supervising sex offenders in the wake of the Stephens case and, in the process, described various errors that (in the opinion of the authors of the article) defendant had made in supervising Stephens.
Defendant submitted other material with its summary judgment motion, including: (1) transcripts of news stories about Stephens that aired on Portland television stations, two of which reported (in October and December 2003) concerns about defendant's supervision of Stephens; (2) an affidavit by the Multnomah County Chief Deputy of Corrections, stating that plaintiff had been incarcerated in various Multnomah County jail facilities between December 30, 2002 and July 18, 2003, and that she had had reasonable access to local newspapers and television news programs during that time; (3) a partial transcript of plaintiff's testimony at Stephens's trial, in which plaintiff stated that she had concluded that Stephens was her attacker when "he got arrested and it was in all the newspapers and stuff"; and (4) plaintiff's deposition testimony acknowledging that police had talked to her about a possible connection between her case and Melissa Bittler's murder before Stephens was arrested and that she had heard about Stephens's arrest from "other people" at the time that it was reported in the news.
Plaintiff responded to defendant's motion by arguing that the dispositive issue was not when plaintiff did or should have known that Stephens was her attacker, but when she should have known about defendant's role in her injury. Plaintiff then argued that that issue could not be decided on summary judgment, because a rational trier of fact could find that plaintiff reasonably did not discover defendant's involvement in her injury until her parents told her about defendant's negligent supervision of Stephens in December 2003. In an affidavit submitted with her response, plaintiff acknowledged that, "on or around July of 2003," she knew that Stephens could have been her assailant. She also averred that she had been incarcerated from December 31, 2002 until October 20, 2003; that she did not watch television or read the newspaper during her incarceration; and that her parents had informed her, in December 2003, that defendant had committed errors in its supervision of Stephens.
The trial court rejected plaintiff's arguments and granted defendant's motion. On plaintiff's appeal, the Court of Appeals reversed, holding that defendant was not entitled to summary judgment because (1) a rational juror could conclude that a reasonable person in plaintiff's circumstances would not necessarily have been aware of media reports questioning defendant's supervision of Stephens before October 28, 2003; and (2) any duty to inquire into defendant's role in the rape did not arise until plaintiff knew that Stephens was under defendant's supervision at the time of the rape, and a triable issue remained as to when plaintiff acquired that knowledge. Johnson, 210 Or.App. at 597-600, 152 P.3d 927. We allowed defendant's petition for review.
There is no dispute that the "discovery rule" that this court has applied to many statutory limitations periods since Berry v. Branner, 245 Or. 307, 421 P.2d 996 (1966), also applies to the 180-day notice of claim requirement at ORS 30.275(2)(b). See Adams, 289 Or. at 237-39, 611 P.2d 1153 (so stating). Neither is there any dispute about the parameters of the discovery rule. At least in theory, the parties agree that the *214 discovery rule does not require actual discovery or knowledge of the claim but, instead, imputes to the plaintiff the level of knowledge that an exercise of reasonable care would have disclosed. See, e.g., Forest Grove Brick v. Strickland, 277 Or. 81, 86, 559 P.2d 502 (1977) (stating that rule). Finally, the parties agree that "discovery" of an injury involves actual or imputed knowledge of three separate elements: harm, tortious conduct,[2] and causation. Gaston v. Parsons, 318 Or. 247, 255, 864 P.2d 1319 (1994). In other words, the notice of claim period does not commence to run, under the discovery rule, until a plaintiff knows or, in the exercise of reasonable care should know, that he or she has been injured and that there is a substantial possibility that the injury was caused by an identified person's tortious conduct. Adams, 289 Or. at 239, 611 P.2d 1153 (so stating).
In the present case, plaintiff's knowledge of her injury is not an issue. The controversy pertains, instead, to when plaintiff "discovered," or reasonably should have discovered, defendant's involvement in her injury  that is, when she knew or should have known that defendant had acted tortiously (by failing to supervise Stephens adequately) and that that tortious conduct had "caused" her injury (by allowing Stephens to remain on the streets, free to commit crimes against plaintiff and other young women).
The question whether and when a plaintiff knew or should have known that his or her injury was caused by a particular defendant's tortious conduct ordinarily is a question of fact for the jury; it may be decided on summary judgment as a matter of law only if the record on summary judgment presents no triable issue of fact. See generally Gaston, 318 Or. at 256-62, 864 P.2d 1319 (discussing when genuine issue of fact exists as to when plaintiff discovered defendant's tortious conduct in medical malpractice case). Defendant contends that, in light of the uncontroverted evidence in the record of media coverage of Stephens's crimes and, later, of defendant's supervision of Stephens, plaintiff has no room to argue that she reasonably did not discover defendant's role in her injury until October 28, 2003, or later.
In that regard, defendant's arguments follow two separate lines. First, defendant focuses on the idea that plaintiff failed to make a reasonable inquiry into the causes of her injury at the appropriate time. It argues that plaintiff was on "inquiry notice"[3] by July 2003, at the very latest, and that a reasonable inquiry at that time would have led to media reports about defendant's negligent supervision of Stephens:
"Plaintiff admits in her affidavit that she was aware `[o]n or around July of 2003 that Ladon Stephens could have been the man that raped me.' * * * Beginning in May 2002, numerous news articles appeared in the local media discussing the [defendant's] supervision of Stephens. Plaintiff testified that, although she did not read any news articles herself, or see [the reports] on the [television] news, she was aware of the media attention to the case, because other people told her about it. Therefore, as of July 2003, plaintiff had full access to sufficient information to trigger reasonable inquiry that would have lead to the discovery that [defendant's] supervision of Stephens was in question."
Defendant is correct insofar as it suggests that the discovery rule does not protect plaintiffs who fail to make a further inquiry when a reasonable person would do so. Gaston, 318 Or. at 256, 864 P.2d 1319. But when, in these circumstances, can we say that a reasonable person would have made a further inquiry?[4] Defendant suggests, in *215 the material quoted above, that that moment arrived when plaintiff learned that Stephens may have been her attacker and that the local media had been covering Stephens's crimes.
We do not agree. The victim of an intentional crime perpetrated by an unknown assailant would have no reason even to speculate that his or her injury might have been caused in part by the tortious conduct of a parole agency or any other third party. Learning the identity of the perpetrator of the crime and that the perpetrator is the subject of local news reports would not necessarily change anything in that regard. The crime victim still would have no reason to suppose that the actions of a third party might be involved. Certainly, a rape victim who learns that her attacker is in the news might be motivated by general curiosity to inquire into that news coverage and, in the process, might acquire information suggesting that the person was negligently supervised by a parole agency. But that is a far cry from saying that, as a matter of law, a reasonable rape victim with that information would inquire into the possibility that tortious conduct by a third party somehow had caused her injury.
Put differently: A duty to inquire must arise from circumstances stronger than the mere drifting possibility that something of interest might come to light. The facts that defendant relies on  plaintiff's knowledge of Stephens's identity and her knowledge that Stephens was being discussed in the media  might raise a question in the mind of a reasonable person about the involvement of a parole agency in plaintiff's injuries, but would not necessarily do so. We reject defendant's theory that, as a matter of law, the record on summary judgment establishes that, by July 2003 at the latest, a reasonable person in plaintiff's circumstances would have made inquiries that would have led to the knowledge that defendant's supervision of Stephens in 1997 might have been deficient.[5]
Defendant argues, in the alternative, that the fact of extensive news coverage relevant to plaintiff's claim between May 2002 and October 3, 2003, is sufficient by itself to establish, as a matter of law, that plaintiff should have known of her claim before October 28, 2003. In that regard, defendant proposes that, for purposes of the discovery rule, an objectively reasonable person should be assumed to be aware of readily available media publications relevant to his or her tort claim. Defendant contends that that proposal is consistent with the idea that, to take advantage of the discovery rule, plaintiffs must "exercis[e] the diligence expected of a reasonable person." Gaston, 318 Or. at 256, 864 P.2d 1319.[6] Defendant notes, moreover, that some federal courts have applied that rule, concluding that defendants were entitled to summary judgment on statute of limitations grounds when defendants had submitted evidence of widespread publicity about events underlying the plaintiffs' claims. See, e.g., Hughes v. Vanderbilt University, 215 F.3d 543 (6th Cir.2000) (publicity in 1994 and 1995 about university's experiments on human subjects in the 1940s was sufficient to charge the plaintiff with constructive knowledge *216 of the events underlying her tort claim against the university, which was based on assertion that she had been subjected to experiments in 1945 when she was eight years old). See also Rakes v. U.S., 442 F.3d 7 (1st Cir.2006) and Moseley v. Wyeth, 2002 WL 32991341 (W.D.Okla.2002) (reaching analogous conclusions).
However, assuming that the opinions of federal courts might carry any weight in our analysis, it is worth noting that at least as many federal cases have reached an opposite result. In Bibeau v. Pacific Northwest Research Foundation, 188 F.3d 1105 (9th Cir. 1999), for example, a plaintiff who had been subjected to radiation experiments in the 1960s, while he was imprisoned at the Oregon State Penitentiary, brought an action in 1995 against the research foundation that conducted the experiments  within two years of reading a news report referring to similar experiments. The defendant moved for summary judgment, arguing that the statute of limitations period had passed. The trial court granted the motion but the Ninth Circuit Court of Appeals reversed. The defendant had submitted "a litany of news reports and other public revelations regarding the * * * experiments," most of which were published in the mid-1980s, but the court concluded that, particularly in light of certain aspects of plaintiff's history and education, the reasonableness of the plaintiff's failure to discover his claim at the time those news reports were published was an issue for the jury. Id. at 1110. Other federal courts have taken a similar view. See, e.g., In Re Swine Flu Products Liability Litigation, 764 F.2d 637 (9th Cir.1985) (in spite of evidence that local paper reported in late 1976 that government's swine flu vaccination program had been suspended because of connection to neurological problems, additional fact-finding was necessary to determine whether the general community awareness of the connection was sufficient to find that the plaintiff should reasonably have known at that time that vaccination caused his wife's death).
In the end, defendant's proposal  that all plaintiffs should be deemed to know all information relating to their claim that has been published in the local media  involves a leap of faith that we are not prepared to make. The fact that news about some event was available at a particular time does not, by itself, resolve whether a reasonable person would have read or heard that news, much less what a reasonable inquiry based on that news would have uncovered.
In the present case, defendant demonstrated that local media outlets had issued stories mentioning defendant's supervision of Stephens as early as June 2002 and directly addressing possible inadequacies in that supervision by December 2002. We are not prepared to say that a juror would be required to conclude, from the mere fact of that coverage, that an objectively reasonable person would have or should have known sufficient facts to trigger the 180-day notice period before October 28, 2003. Although it is true that plaintiff's responsive submissions primarily addressed her actual knowledge (or lack thereof) of defendant's involvement in her injury, the fact remains that defendant's submissions were insufficient to establish, as a matter of law, the level of awareness that an objectively reasonable person would have had under the circumstances.[7] We agree with the Court of Appeals that there is a triable issue of fact as to when plaintiff should have known of defendant's connection to her injury. It follows that the trial court erred in granting defendant's motion for summary judgment.
The decision of the Court of Appeals is affirmed. The judgment of the circuit court is reversed and the case is remanded to the circuit court for further proceedings.
NOTES
[1] ORS 30.275 provides, in part:

"(1) No action arising from any act or omission of a public body or an officer, employee or agent of a public body * * * shall be maintained unless notice of claim is given as required by this section.
"(2) Notice of claim shall be given within the following applicable period of time, not including the period, not exceeding 90 days, during which the person injured is unable to give the notice because of the injury or because of minority, incompetency or other incapacity:
"* * * * *
"(b) For all other claims, within 180 days after the alleged loss or injury."
[2] It may be argued that there is a fourth element, viz., the probable identity of the tortfeasor. We think that that element inheres in the concept of "tortious conduct"  someone, after all, must have carried out the "conduct."
[3] "Inquiry notice" is a confusing and imprecise label. "Notice" may cause an "inquiry" based on it, but the inquiry is not one made on "inquiry notice." We specifically disapprove of the use of that term. See Greene v. Legacy Emanuel Hospital, 335 Or. 115, 123, 60 P.3d 535 (2002) (to the same effect).
[4] And  perhaps even more importantly  when can we say that a reasonable further inquiry would have led to the discovery of further evidence that would give plaintiff knowledge of her claim?
[5] Of course, before the plaintiff may be charged with responsibility for the passage of time, it also must be true that the inquiry that plaintiff would have conducted would have brought the pertinent facts to light. See Doe v. American Red Cross, 322 Or. 502, 910 P.2d 364 (1996) (illustrating proposition).
[6] Defendant also argues that the rule is consistent with the approach taken by the legislature in many "notice" statutes  statutes that "presume[] that a reasonable person reads the local newspaper for purposes of notice." Defendant cites, as examples, ORCP 7 D(6) (providing for court order for service of summons by, among other methods, publication in a newspaper of general circulation) and ORS 113.155 (notice of initiation of estate proceedings can be accomplished by publishing information once a week for three consecutive weeks in a newspaper published in the county in which the estate proceeding is pending). In fact, however, those statutes are irrelevant to the issue at hand, viz., the plaintiff's actual or presumed state of awareness. Such statutes, which declare that, as a matter of law, publication itself qualifies as notice, are designed to further the ability of courts to consider various forms of legal proceedings. They cannot by their own terms realistically be expanded to encompass the different issues associated with the question of potential plaintiffs' imputed knowledge of, e.g., the identify of one who harmed them.
[7] There may be cases in which news coverage of a topic is so widespread that a general community awareness (and, thus, the awareness of any objectively reasonable person) can be determined as a matter of law. However, this is not such a case.