Argued and submitted September 12, 2001, decision of Court of Appeals reversed, and case remanded to Court of Appeals for further proceedings October 24, 2002

See 189 Or App 499, 76 P3d 677 (2003)

William VOKOUN
and Paula Vokoun,
*Petitioners on Review,*

*v.*

CITY OF LAKE OSWEGO,
a municipal corporation,
*Respondent on Review.*

(CC 96-11-052; CA A101203; SC S47931)

56 P3d 396

Mark P. Reeve, Portland, Reeve Kearns PC, argued the cause and filed the briefs for petitioners on review. With him on the briefs was Tracy Pool Reeve.

Timothy J. Sercombe, Portland, Preston Gates & Ellis LLP, argued the cause and filed the briefs for respondent on review. With him on the briefs was William K. Kabeiseman.

Mark C. McClanahan, Portland, filed a brief on behalf of *amici curiae* George Spada and Marietta Spada.

Harry Auerbach, Portland, Senior Deputy City Attorney, City Attorney's Office, filed a brief on behalf of *amicus curiae* League of Oregon Cities.

W. Eugene Hallman, Pendleton, Hallman and Dretke, filed a brief on behalf of *amicus curiae* Oregon Trial Lawyers Association.

LEESON, J.

**LEESON, J.**

Plaintiffs William and Paula Vokoun (plaintiffs) challenge a decision of the Court of Appeals that reversed a jury verdict in their favor on their claims for inverse condemnation and negligence against the City of Lake Oswego (city) after the trial court denied the city's motion for a directed verdict on both claims. *Vokoun v. City of Lake Oswego*, 169 Or App 31, 7 P3d 608 (2000). For the reasons that follow, we reverse the decision of the Court of Appeals and remand the case to that court for further proceedings.

## I.  FACTS

Because the jury found in plaintiffs' favor, we view the evidence, and all inferences that reasonably may be drawn from it, in the light most favorable to plaintiffs. *Greist v. Phillips*, 322 Or 281, 285, 906 P2d 789 (1995). Our inquiry is whether there was any evidence from which the jury could have found the facts necessary to support its special verdicts on plaintiffs' claims for inverse condemnation and negligence. *See Brown v. J. C. Penney Co.*, 297 Or 695, 705, 688 P2d 811 (1984) (describing standard of review in determining whether trial court erred in denying motion for directed verdict). Our review of the record "is circumscribed by the case actually presented to the jury through the pleadings, evidence, and jury instructions." *Northwest Natural Gas Co. v. Chase Gardens, Inc.*, 333 Or 304, 310, 39 P3d 846 (2002).

In 1989, plaintiffs purchased a home on the north side of Rocking Horse Lane in the Red Fox Hills Subdivision in Lake Oswego. The subdivision had been developed in the early 1970s on a hill above Tryon Creek State Park. Plaintiffs' property slopes down to the north, into a ravine at the bottom of the hill. The ravine runs approximately parallel to the northern border of plaintiffs' property. Plaintiffs' house is located on the south side of their property.

The city built a storm drain that runs underground from Rocking Horse Lane north along a drainage easement near the western border of plaintiffs' property.[1] An outfall

---

[1] On appeal and on review before this court, the city has maintained that it did not build the storm drain; rather, the city asserts that the developer of the Red Fox

pipe, 12 inches in diameter, located near the northwest corner of plaintiffs' property, discharges the water into the ravine. The water then flows east along a drainage course towards Tryon Creek. During periods of heavy rainfall, the outfall pipe discharges a high volume of water.

Before the Red Fox Hills Subdivision and storm drain were built, storm water from approximately one acre of land drained to the location where the storm drain now exists. After the subdivision was built, the outfall pipe discharged runoff from about seven acres of land into the drainage course, causing extensive erosion. By 1986, in the words of a city engineer, the drainage course "needed some significant attention." However, the city has a "complaint driven" repair policy for maintaining storm drains, and, apparently because no one had complained, the city did not undertake any repairs at that time.

The city also has a five-year plan for determining which capital improvements projects—including projects involving storm drains—to undertake. That plan is incorporated into the city's budget. The plan addresses projects that are estimated to cost $25,000 or more. The city council decides which proposed projects to include in the capital improvements plan. Undertaking a capital improvement project that is not in the plan and that costs more than $25,000 usually requires the city council to adopt a supplemental budget. The city did not consider whether to place improvement of the storm drain and drainage course at issue in this case in the capital improvement plan. Neither did the city council consider whether to adopt a supplemental budget to repair the erosion problems associated with the storm drain.

Before buying their property in 1989, plaintiffs discovered a hole approximately eight feet deep around the storm drain outfall pipe. The hole appeared to have been caused by erosion from water coming out of the outfall pipe. Although the point where the pipe discharged the storm

Hills Subdivision built the drain and later dedicated it to the city. However, in its answer, the city admitted that it built the storm drain. *See Yates v. Large*, 284 Or 217, 223, 585 P2d 697 (1978) (holding admission of fact in pleadings is judicial admission and normally conclusive on party making it).

water was beyond the boundary of the property that plaintiffs were considering buying, the hole had swallowed the property marker for the northwest corner of the lot. Plaintiffs notified the city about the hole, and, after plaintiffs had purchased the property, the city's maintenance staff filled the hole with asphalt debris left over from a street project in another area of the city. After filling the hole with pieces of asphalt, the maintenance department did not inspect the outfall site or the drainage course to determine whether filling the hole had solved the erosion problem. Neither did the city tell plaintiffs that plaintiffs were responsible for inspecting the area to determine whether filling the hole had stopped the erosion at the outfall site or along the drainage course. In fact, filling the hole did not stop the erosion along the drainage course.

On February 8, 1996, following a period of unusually heavy rain, a landslide occurred on the hillside on which plaintiffs' property is located. The landslide continued to grow in the following months. The landslide caused a four-foot drop in the land approximately nine feet from plaintiffs' house and a 20-foot drop approximately 19 feet from the house. The landslide damaged a deck on the house and a dog run, and both had to be removed. The landslide also destroyed many trees. If plaintiffs had not taken remedial action, the land would have continued to slide, eventually destroying the house.

In November 1996, plaintiffs filed this action against the city for inverse condemnation and negligence.[2] In their claim for inverse condemnation, plaintiffs alleged that the city had "taken" their property for a public use by constructing a storm drain pipe and outfall pipe in a manner that destabilized the soils on and adjacent to plaintiffs' property, causing a landslide. As relates to issues on appeal regarding plaintiffs' negligence claim, plaintiffs alleged, among other things, that the city was negligent by failing properly to inspect the outfall and drainage course to discover the erosion that was occurring and to take reasonable steps to prevent a catastrophic landslide.

---

[2] Plaintiffs' complaint also alleged other claims that are not at issue here.

As noted, in its answer, the city admitted that it built the storm drain in question. The city contended that plaintiffs had failed to state facts sufficient to constitute a claim and that the city was immune from liability for plaintiffs' negligence claim under ORS 30.265(3)(c).[3]

At trial, plaintiffs presented evidence that the water that the storm drain diverted into the drainage course eroded more than nine tons of soil per acre each year. Before the development of the Red Fox Hills Subdivision and construction of the storm drain, there had not been a drainage course running from the outfall site to Tryon Creek. One of plaintiffs' experts testified that the speed of the water coming out of the outfall pipe likely caused the extensive erosion that occurred along the drainage course. Another expert testified that the erosion had been occurring for about 25 years before the landslide, or about since the time that the storm drain and outfall pipe were installed, and that the primary cause of the landslide was the erosion in the drainage course that had removed the soil at the toe of the slope that supported the hillside on which plaintiffs' property is located. According to that expert, the city should have been aware of the potential for further erosion in the drainage course when it filled the hole at the outfall site in 1989. Finally, plaintiffs presented evidence that the city could have prevented the landslide if it had "backfilled" the length of the drainage course with compacted soil or had constructed an enclosed pipe to carry water from the outfall pipe east along the drainage course to Tryon Creek. Either of those repairs would have cost more than $25,000.

At the close of plaintiffs' case, the city moved for a directed verdict on plaintiffs' inverse condemnation and negligence claims. The city argued that, as a matter of law, the damage to plaintiffs' property from the landslide was not a

---

[3] ORS 30.265 provides, in part:

"(3) Every public body and its officers, employees and agents acting within the scope of their employment or duties * * * are immune from liability for:

"* * * * *

"(c) Any claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused."

taking. The city also argued that, as a matter of law under ORS 30.265, discretionary immunity barred plaintiffs' negligence claim. The trial court denied both motions, and the jury thereafter returned special verdicts for plaintiffs on both claims.[4]

The city appealed, raising multiple assignments of error. The Court of Appeals reversed, addressing only the city's contention that the trial court erred in denying the city's motion for a directed verdict on plaintiffs' inverse condemnation and negligence claims. *See Vokoun*, 169 Or App at 33 (those two assignments "dispositive"). The Court of Appeals viewed plaintiffs' inverse condemnation claim as being predicated on the city's negligence. *See Vokoun*, 169 Or App at 40 ("In this case, plaintiffs expressly predicate their claims on the City's negligence."). Relying primarily on *Patterson v. Horsefly Irrigation Dist.*, 157 Or 1, 69 P2d 282, 70 P2d 33 (1937), the Court of Appeals held that, as a matter of law, negligent interference with property rights does not support a claim for inverse condemnation. *Vokoun*, 169 Or App at 37-38. The Court of Appeals also held that, as a matter of law, the city had made discretionary policy decisions that entitled it to discretionary immunity under ORS 30.265. *Id.* at 42-43. We allowed plaintiffs' petition for review. We begin our analysis with the inverse condemnation claim.

## II.  INVERSE CONDEMNATION

██ Article I, section 18, of the Oregon Constitution provides, in part, that "[p]rivate property shall not be taken for public use * * * without just compensation[.]" Private property is "taken" for public use or benefit through the exercise of the power of eminent domain. *GTE Northwest, Inc. v. Public Utility Commission*, 321 Or 458, 466, 900 P2d 425 (1995). *See Dept. of Trans. v. Lundberg*, 312 Or 568, 571 n 1, 825 P2d 641

---

[4] The jury awarded plaintiffs $138,410 on their inverse condemnation claim. The jury awarded each of the plaintiffs $69,205 for property damage, $80,750 for economic damage, and $12,000 for noneconomic damage on plaintiffs' negligence claim. The trial court struck the property damage award as duplicative of the inverse condemnation award and then entered judgment for plaintiffs on the balance, $323,910, plus attorney fees of $30,224. Because of the posture in which this case appears before this court, we do not address whether, as a matter of law, plaintiffs may recover both on their claim for inverse condemnation and on their claim for negligence.

(1992) (describing eminent domain as "the power inherent in a sovereign state of taking or of authorizing the taking of any property within its jurisdiction for a public use or benefit"). A governmental unit with eminent domain authority can exercise its power of eminent domain by instituting condemnation proceedings. *Id.* An action against the government to recover the value of private property that the government has taken without first filing condemnation proceedings is referred to as an action for "inverse condemnation." *See Suess Builders v. City of Beaverton*, 294 Or 254, 258 n 3, 656 P2d 306 (1982) (claim for inverse condemnation is shorthand description of process through which landowner recovers just compensation for governmental taking of property even though government did not institute condemnation proceedings).

■       To establish a taking by inverse condemnation, the plaintiff is not required to show that the governmental defendant deprived the plaintiff of all use and enjoyment of the property at issue. *See Morrison v. Clackamas County*, 141 Or 564, 568, 18 P2d 814 (1933) (any destruction, restriction, or interruption of common and necessary use and enjoyment of property constitutes taking). A "substantial interference" with the use and enjoyment of property is sufficient. *Hawkins v. City of La Grande*, 315 Or 57, 68-69, 843 P2d 400 (1992).

Before this court, plaintiffs first argue that the Court of Appeals erred in holding that negligent governmental interference with property rights will not support a claim for inverse condemnation. They contend that, under this court's decisions in *Morrison* and *Tomasek v. Oregon Highway Com'n*, 196 Or 120, 248 P2d 703 (1952), a public body is liable in inverse condemnation for the consequences of a public use, "regardless of whether the consequences are themselves expected or intended, regardless of 'fault.'" In the alternative, plaintiffs contend that the Court of Appeals erred in analyzing their claim for inverse condemnation as being predicated on the city's negligence. According to plaintiffs, they based their inverse condemnation claim on the city's acts, not on the city's omissions regarding maintenance of the

drainage course and repair of erosion along the drainage course.

The city responds that this court's cases, including *Morrison* and *Tomasek*, establish that a "purposive act" is an element of an inverse condemnation claim and that "there is no allegation or proof in this case that the city designed or constructed the subdivision stormwater drainage system." Rather, "[t]he only action of the City related to the subdivision drainage system was its presumed acceptance of the system in the plat dedication." The city's alleged failure to maintain the drainage course and repair the erosion along the course, the city continues, is not the type of "purposive act" that this court's cases have held is required to state a claim for inverse condemnation. The city does not comment on whether its admission that it built the storm drain would satisfy what it views as the "purposive act" requirement. In addition, the city argues that plaintiffs failed to establish a taking in this case because the damage that the landslide caused to their property did not amount to a substantial interference with their use and enjoyment of the property.

█ We begin with plaintiffs' first argument, namely, that the Court of Appeals erred in holding that a takings claim cannot be based on interference with property rights that is "merely a consequence of negligent government conduct." *Vokoun*, 169 Or App at 37. Plaintiffs are mistaken. This court long has held that a claim for inverse condemnation requires a showing that the governmental acts alleged to constitute a taking of private property were done with the intent to take the property for a public use. *See Gearin v. Marion County*, 110 Or 390, 402, 223 P 929 (1924) (distinguishing eminent domain from tort, in part, by whether governmental acts done with intent to take private property for public use). *Patterson*, on which the Court of Appeals relied, explained by analogy the difference between negligence and inverse condemnation, and it cited *Gearin* for the proposition that governmental negligence will not support a claim for inverse condemnation. *Patterson*, 157 Or at 17-19. Plaintiffs apparently believe that *Morrison* and *Tomasek* eliminated the requirement that a claim for inverse condemnation requires a showing that the governmental defendant

intended to take private property for a public use. We disagree.

In *Morrison*, the plaintiff alleged that the defendant county had built a jetty in the Sandy River that closed the southerly portion of the river channel, thereby forcing the entire flow of the stream to the northerly bank. 141 Or at 566. The next spring, when the river reached its annual high water stage, the entire flow of the river was diverted over the plaintiff's land, destroying it. *Id.* at 566-67. In discussing the law of inverse condemnation, this court stated:

> "In an action of this character it is no defense that there was no specific intention on the part of defendant to appropriate plaintiff's property, but the defendant *must be held to have intended to do those things which are the natural and ordinary consequences of [its] act.*"

*Id.* at 569 (emphasis added). By alleging that the county intended to construct the jetty in a manner that necessarily caused the flooding that destroyed the plaintiff's property, the plaintiff had stated a claim for inverse condemnation. *Id.* *Morrison* thus stands for the proposition that the factfinder may infer the intent-to-take element of a claim for inverse condemnation from the natural and ordinary consequences of the government's act. *Accord Levene v. City of Salem*, 191 Or 182, 196-97, 229 P2d 255 (1951) (municipal act resulting in "a direct and continuous trespass upon real property, as by diverting the flow of a stream from its natural course onto the property, or by flooding the property through a drain or sewer so constructed that such flooding is a necessary result of the construction," is "taking").

*Tomasek* is consistent with *Morrison*. In that case, the Highway Department constructed a grade, roadbed, and bridge in a manner that closed off most of a flood plain. *Tomasek*, 196 Or at 138-39. Closing off the flood plain, combined with excavating rock from the river bed, substantially increased the velocity of the current in the main river and changed its course and channel from its original location to a place over and across the plaintiff's land. *Id.* Relying on *Morrison*, this court held that the Highway Department had taken the plaintiff's land for a public use without first condemning the land. *Id.* at 148-50. *See also Hawkins*, 315 Or 57

(holding intentional release of sewage-laden water onto private property to prevent overflow at sewage treatment plant, killing livestock and crops, supported claim for taking personal property by inverse condemnation).

■       Thus, neither *Morrison* nor *Tomasek* eliminated the requirement that a claim for inverse condemnation requires a showing that the governmental defendant intended to take private property for a public use. A factfinder may infer the intent to take from the governmental defendant's action if, as this court stated in *Morrison*, the natural and ordinary consequence of that action was the substantial interference with property rights. The Court of Appeals did not err for the first reason that plaintiffs have asserted.

■       We turn to plaintiffs' argument that the Court of Appeals erred nonetheless because it mischaracterized plaintiffs' inverse condemnation claim as being predicated on the city's negligent maintenance of the outfall pipe. We agree. Plaintiffs' complaint states that their claim for inverse condemnation was based on the city's construction of the storm drain pipe and outfall in a manner that created a drainage course where one had not been previously, and caused accelerated erosion along that course, thereby destabilizing the soils on and adjacent to plaintiffs' property. Accordingly, the question is whether plaintiffs presented evidence from which a jury could find that the natural and ordinary consequence of the city's construction of the storm drain was to destabilize plaintiffs' property, causing the landslide. As we have explained, an appellate court will not reverse the trial court's denial of a motion for a directed verdict if there is *any* evidence in the record from which the jury could find the facts necessary to establish the elements of the claim. *See Brown*, 297 Or at 705 (stating standard of review of denial of motion for directed verdict).

As noted, in this case, the city built the storm drain. The city does not dispute that water from that storm drain caused erosion in the drainage channel. The parties presented conflicting evidence about what caused the landslide. Plaintiffs' evidence showed that the hillside on which plaintiffs' property is located was stable before the storm drain was built; there had not been a drainage course in the ravine

beneath plaintiffs' property before the storm drain was built; the storm drain channeled water consistent with the way that the drain had been designed and built 25 years earlier; and water from the drain, without any intervening causes, had created the drainage course and caused the erosion that undermined the hillside, causing the landslide.

That the jury heard conflicting evidence on virtually every issue regarding plaintiffs' claim for inverse condemnation is of no moment in our review of whether the trial court erred in denying the city's motion for a directed verdict on that claim. The city built the storm drain, and it is undisputed that a storm drain is a public work, serving a public purpose. Before the storm drain was built, there was no natural drainage course in the ravine. The storm drain collected more than five times the amount of water that naturally flowed through the area where the landslide occurred. The outfall pipe dispersed that water with such force that the water carved a drainage course along the ravine. The water was directed at, and caused, unnatural erosion along the drainage course, undermining the toe of the slope that supported the hillside on which plaintiffs' property is located. One reasonable inference from the foregoing evidence is that the landslide was the natural and ordinary (even inevitable) consequence of the city's construction of the storm drain in that manner. It follows that there is evidence in the record to support the jury's verdict.

Nonetheless, the city argues, there is no evidence in the record to support plaintiffs' claim that the landslide caused *substantial* interference with their property rights. *See Hawkins*, 315 Or at 68-69 (test for whether damage to property rises to the level of a taking is whether there has been "substantial interference" with use and enjoyment of property). Rather, the city contends, the landslide did not functionally impair the use of plaintiffs' property. That argument is without merit. As we have explained, plaintiffs presented evidence that the landslide caused such a significant drop in plaintiffs' land within a few feet of their home that a deck on the house and a dog run had to be removed. Without remedial action, the house would have collapsed. On that evidence, the jury could find that plaintiffs had suffered a substantial interference with their property rights. The trial

court did not err in denying the city's motion for a directed verdict on plaintiffs' inverse condemnation claim.

Our decision on plaintiffs' inverse condemnation claim does not address all the assignments of error that the city raised on appeal regarding that claim or the relationship of that claim to plaintiffs' negligence claim. *See Vokoun*, 169 Or App at 33 (noting that Court of Appeals did not address all assignments of error). Accordingly, the case must be remanded to the Court of Appeals to address those other assignments of error. Moreover, at the Court of Appeals, the city argued that the trial court erred in a number of respects regarding plaintiffs' negligence claim. The Court of Appeals did not reach those arguments because it held, as a matter of law, that the city was immune from liability under ORS 30.265(3). *See id.* at 43 (so holding). Whether the Court of Appeals also must address the city's remaining assignments of error regarding plaintiffs' negligence claim depends, in part, on whether the Court of Appeals erred in its holding on discretionary immunity. We turn to that issue.

## III.  DISCRETIONARY IMMUNITY

Discretionary immunity protects governmental defendants from liability for certain types of decisions, namely, those that require supervisors or policy makers to assess costs and benefits, and to make a choice among competing goals and priorities. *McBride v. Magnuson*, 282 Or 433, 437, 578 P2d 1259 (1978). The doctrine of discretionary immunity does not immunize a decision not to exercise care at all, if action of some kind is required. *See Garrison v. Deschutes County*, 334 Or 264, 274, 48 P3d 807 (2002) (so stating). To qualify for discretionary immunity under ORS 30.265(3)(c), the city must show that it made a decision "involving the making of policy" as opposed to a "routine decision[ ] made by employees in the course of their day-to-day activities[.]" *See Mosley v. Portland School Dist. No. 1J*, 315 Or 85, 89, 843 P2d 415 (1992) (stating test for discretionary immunity). The burden is on the governmental defendant to establish its immunity. *Stevenson v. State of Oregon*, 290 Or 3, 15, 619 P2d 247 (1980).

As noted, in this case, the city moved for a directed verdict on plaintiffs' negligence claim on the ground that the city's failure to inspect and maintain the outfall and drainage course was subject to discretionary immunity under ORS 30.265(3)(c). The trial court denied the city's motion and submitted plaintiffs' negligence claim to the jury,[5] which found the city liable. In reversing the trial court, the Court of Appeals held that the city's choice about which capital improvement projects exceeding $25,000 to undertake, which did not include inspection, maintenance, or repair of the drainage outfall at issue in this case, was "precisely the sort of discretionary policy decision that is subject to ORS 30.265(3)." *Vokoun*, 169 Or App at 42-43.

On review, plaintiffs contend that the Court of Appeals decision erroneously creates a presumption of immunity whenever a local government adopts a budget that fails to address that government's duty to inspect and maintain public facilities. In this case, plaintiffs contend, the city presented no evidence that policy makers had considered the risks to plaintiffs' property from erosion and alternative means for mitigating it. Therefore, they assert, the city failed to establish its immunity. The city responds that, although plaintiffs couched their specification of negligence in terms of the city's failure to inspect and maintain the drainage course, the underlying issue is the city's failure to acquire the drainage course from the state and improve it either by constructing a closed pipe along the length of the course or filling it with compacted soil. As to the decision not to acquire and improve the drainage course, the city argues, it is immune from liability under the doctrine of discretionary immunity, because the city's governing body made policy decisions reflected in the capital improvements plan that did not include acquiring and improving the drainage course at issue in this case.[6] For the reasons that follow, we conclude that, on

---

[5] The trial court instructed the jury as follows:

"In evaluating Plaintiffs' negligence claim, you may consider only the City's acts or omissions *in inspecting or maintaining* the drain channel. If Plaintiffs have proven by a preponderance of the evidence that the landslide was caused by acts or omissions in the maintenance or inspection of the drain channel, then you may find for Plaintiffs."

(Emphasis added.)

[6] Regarding plaintiffs' allegation that the city was negligent in failing to inspect and maintain the outfall and drainage course, the city contends that it had

the facts of this case, the Court of Appeals erred in holding that the city had established its immunity to plaintiffs' negligence claim.

As we have explained, the city has a complaint-driven policy regarding inspection and repair of storm drains. Plaintiffs complained about the hole at the outfall site in 1989. Maintenance employees responded to the complaint by going to the area to assess what should be done. They discovered that water from the outfall pipe was causing unnatural erosion along the drainage course in addition to the large hole that plaintiffs had identified. Maintenance employees decided to repair the erosion by filling the hole with asphalt debris. The decision how to respond to the erosion problem about which plaintiffs had complained was a routine decision made by employees in the course of their day-to-day activities. Such decisions do not qualify for discretionary immunity. *See Mosley*, 315 Or at 89 (describing decisions made by employees in course of day-to-day activities as not qualifying for discretionary immunity). Even assuming that city employees subsequently had inspected their repair, discovered that filling the hole with asphalt debris had not solved the erosion problem, and that adequate repairs would have cost more than $25,000, the capital improvements plan would not necessarily have barred the city from making the necessary repairs. That is so because, as we explained earlier in this opinion, city policy permitted the city council to adopt a supplemental budget to pay for repairs costing more than $25,000. The city presented no evidence that the city council considered whether to adopt a supplemental budget to repair the erosion that the outfall pipe at issue in this case had caused. On this record, we conclude that the fact that the city had adopted a capital improvements plan that did not include purchasing and improving the drainage course does not establish the city's immunity from plaintiffs' negligence claim.[7] The trial court did not err in denying the city's motion for a directed verdict on that claim, and the Court of Appeals

no such duty because the drainage course is on state, not city, property. That argument relates to whether the city was negligent at all, not whether it made policy choices that establish its discretionary immunity.

[7] We need not decide whether, assuming the city council had considered and then decided not to approve a supplemental budget for correcting the erosion in the drainage course, such a policy judgment would qualify for discretionary immunity.

erred in holding otherwise. On remand, the Court of Appeals must address the city's other assignments of error regarding plaintiffs' negligence claim. *See Vokoun*, 169 Or App at 33 (declining to address other assignments of error because holding on discretionary immunity dispositive).

The decision of the Court of Appeals is reversed, and the case is remanded to the Court of Appeals for further proceedings.