Argued and submitted May 6, reversed and remanded on claims for
negligence and timber trespass; otherwise affirmed October 15, 2008

Kathleen M. WORMAN
and Jeffrey Worman,
*Plaintiffs-Appellants,*

*v.*

COLUMBIA COUNTY, OREGON,
a political subdivision of the
State of Oregon,
*Defendant-Respondent.*

Columbia County Circuit Court
052504; A136006

195 P3d 414

Thomas M. Christ argued the cause for appellants. With him on the briefs were Julie A. Smith and Cosgrave Vergeer Kester LLP.

David C. Lewis argued the cause for respondent. With him on the brief was Miller & Wagner, LLP.

Before Wollheim, Presiding Judge, and Landau, Judge, and Sercombe, Judge.

SERCOMBE, J.

**SERCOMBE, J.**

After discovering damage to the trees and shrubs on their property, plaintiffs Kathleen and Jeffrey Worman brought inverse condemnation, negligence, and timber trespass claims against defendant Columbia County based on allegations that the damage resulted from herbicide sprayed by county personnel. The trial court granted summary judgment in favor of the county, and plaintiffs appeal. We affirm the judgment as to the inverse condemnation claim but reverse and remand as to the negligence and timber trespass claims.

We state the facts in the light most favorable to plaintiffs, the nonmoving parties. ORCP 47 C. Plaintiffs' home sits at the corner of two roads. In mid-February 2004, plaintiffs discovered that their trees, shrubs, and grass near the roads were either dead or dying. At that point, based on the pattern of damage, plaintiffs suspected that someone had sprayed some type of herbicide into their yard, but they were unable to identify the culprit. As part of plaintiffs' investigation of the damage, Kathleen Worman (Kathleen) contacted the county to determine whether it had sprayed herbicide near their home. She spoke with someone from the county road department who told her that the county had not sprayed in plaintiffs' area for three years and that the county did not keep records of its spraying.

In April 2004, plaintiffs filed a form entitled "Report of Loss Allegedly Caused by Use of Insecticides, Herbicides, Fungicides and Other Pesticides" with the Oregon Department of Agriculture. On that form, plaintiffs reported loss due to an herbicide application in the fall of 2003. They identified damage to "ornamentals" and listed grass and various bushes and trees affected by the herbicide. The form also asked plaintiffs to identify "[w]ho made the pesticide application." In response to that question, plaintiffs marked "Unknown." However, in response to a later question— "Suspected cause or source of damage (mark all appropriate)"— plaintiffs marked boxes for "[g]round application"; "[n]eighbor spraying"; and "[o]ther." Next to "[o]ther," plaintiffs wrote "[m]ay be Columbia County Road Dept." Plaintiffs

then offered the following narrative description of the damage: "An unknown person sprayed a mix of Round Up + Cross Bow beginning at our property boundary at front of house and around side of property line * * *. It was a deliberate, malicious use of herbicide."

Two months after filing the "report of loss," Kathleen spoke with a county commissioner about the damage to plaintiffs' yard. She told the commissioner that the county road department had denied spraying in plaintiffs' area and had claimed that the county did not maintain records regarding spraying. The commissioner then contacted Hill, the director of the county road department, regarding plaintiffs' concerns. Plaintiffs subsequently learned that the county not only sprayed the roads in the area of plaintiffs' property in October 2003, but also maintained records that established that fact.

One of the county's employees, Peterson, had sprayed herbicide on the roadside ditches near plaintiffs' property on October 30, 2003. That much is undisputed; the focus of the parties' dispute is what *else* Peterson sprayed on that date. According to Peterson, one of plaintiffs' neighbors, Roth, approached him while he was spraying the ditches. Roth asked Peterson to spray some blackberries that were growing on his property and then told Peterson to spray "everything" on plaintiffs' nearby property as well. Roth told Peterson that he had had problems with Kathleen in the past and that she was a "troublemaker." Peterson, according to his deposition testimony, nevertheless refused to spray plaintiffs' property and told Roth that "the [c]ounty has been sued by her in the past and I don't—you know, I don't want any problem."

By Peterson's account, he sprayed as far onto Roth's property as his truck could spray, which involved turning on all seven heads of his spray equipment. At that point, he had the spray at "kind of full power." Peterson claimed that he drove to the edge of Roth's property and then decided, "well, I better shut it off here, you know." That is, he acknowledged driving past plaintiffs' property but asserted that his spray equipment was off at the time.

Peterson also had an opportunity to view the damage at plaintiffs' property. He concluded that, "with that type of a pattern [of damage], anybody could have made that, whether it be on the road, off the road, you know." He also agreed that "the pattern was consistent with the pattern that a high-pressure sprayer would make." Peterson contended, however, that not only did he not spray plaintiffs' property, but that it would have been *impossible* for his spray truck to have caused that damage. According to Peterson, the damage to the property was in a "wavelike" pattern, whereas the county's truck does not spray in that type of pattern. Moreover, he asserted that the product that he used that day —Garlon 4—does not kill grass. In support of the latter contention, Peterson relied on the "spray report" that he filled out for October 30, 2003, which listed Garlon 4 as the product that was sprayed.[1]

Plaintiffs, on the other hand, dispute Peterson's claim that he skipped over their property. They surmise that, given the timing of the events, the nature of the damage to their property, and the county's initial denial of spray activity in their area, that Peterson either intentionally or accidentally sprayed their yard in the fall of 2003. Their complaint, which they filed in October 2005, alleges three claims against the county—inverse condemnation, negligence, and timber trespass—based on Peterson's intentional or accidental spraying.

In February 2007, the county moved for summary judgment on all three claims. The county argued as follows: (1) plaintiffs' claims were barred by the failure to give timely tort claim notice; (2) plaintiffs could produce no evidence from which a reasonable juror could conclude that the county sprayed plaintiffs' property; and (3) alternatively, plaintiffs failed to state claims for inverse condemnation or timber trespass. The trial court agreed with the county in all respects and granted the motion. Plaintiffs appeal, arguing that the trial court erred on each ground.

---

[1] The spray report states that the contents of the sprayer were a mix of "4 parts Garlon 4 and 1 part In-Place Adjuvent. (I.E. 20 gals Garlon 4 to 5 gals In-Place.)." Plaintiffs contend that the report is not trustworthy because of Peterson's motive to fabricate.

■    Initially, plaintiffs contend that the trial court erred in concluding, as a matter of law, that they failed to provide notice of their claim to the county within 180 days of their injury, as required by ORS 30.275(2)(b).[2] The question of timely notice under ORS 30.275(2)(b), as the Supreme Court recently explained in *Johnson v. Mult. Co. Dept. Community Justice*, 344 Or 111, 118, 178 P3d 210 (2008), turns on when plaintiffs "discovered" their injuries:

> "There is no dispute that the 'discovery rule' that this court has applied to many statutory limitations periods since *Berry v. Branner*, 245 Or 307, 421 P2d 996 (1966), also applies to the 180-day notice of claim requirement at ORS 30.275(2)(b). *See* [*Adams v. Oregon State Police*, 289 Or 233, 237-39, 611 P2d 1153 (1980)]. Neither is there any dispute about the parameters of the discovery rule. At least in theory, the parties agree that the discovery rule does not require *actual* discovery or knowledge of the claim but, instead, imputes to the plaintiff the level of knowledge that an exercise of reasonable care would have disclosed. *See, e.g., Forest Grove Brick v. Strickland*, 277 Or 81, 86, 559 P2d 502 (1977) (stating that rule). Finally, the parties agree that 'discovery' of an injury involves actual or imputed knowledge of three separate elements: harm, tortious conduct,[2] and causation. *Gaston v. Parsons*, 318 Or 247, 255, 864 P2d 1319 (1994). In other words, the notice of claim period does not commence to run, under the discovery rule, *until a plaintiff knows or, in the exercise of reasonable care should know, that he or she has been injured and that there is a substantial possibility that the injury was caused by an identified person's tortious conduct. Adams*, 289 Or at 239 (so stating).

> ──────────

> "[2] It may be argued that there is a fourth element, *viz.*, the probable identity of the tortfeasor. We think that that element inheres in the concept of 'tortious conduct'—someone, after all, must have carried out the 'conduct.' "

(Second emphasis added.)

───────

[2] The Oregon Tort Claims Act, ORS 30.260 to 30.300, regulates tort claims against public bodies and their agents. ORS 30.275(1) provides that "[n]o action arising from any act or omission of a public body * * * shall be maintained unless notice of claim is given as required by this section." ORS 30.275(2)(b) requires that a "notice of claim shall be given * * * within 180 days after the alleged loss or injury" for claims that are not wrongful death claims.

■      As was the case in *Johnson*, plaintiffs' knowledge of their injury is not at issue; by February 2004, they were aware that their yard had been damaged. The question in this case is when plaintiffs knew, or in the exercise of reasonable care should have known, that there was a "substantial possibility" that the injury was caused by an identified person's tortious conduct.[3] That question "is a question of fact for the jury; it may be decided on summary judgment as a matter of law only if the record on summary judgment presents no triable issue of fact." *Johnson*, 344 Or at 118.

        The county offers two reasons why, as a matter of law, plaintiffs knew by April 2004 of a "substantial possibility" that the county's spraying activities had injured them. Initially, the county argues that, when Kathleen spoke with the county road department by telephone in early 2004, the woman who answered the phone told her, "that's Jeff Peterson's job. He keeps spray locations in his time cards." According to the county, had plaintiffs followed up on that information, they would have discovered that Peterson had sprayed in their area in October 2003.

        The only evidence that the county offers in support of its version of the telephone conversation is an excerpt from Kathleen's deposition testimony. In that excerpt, she responds to questions concerning a letter that she had written, apparently sometime in November 2004:

        "Q:  Now, the paragraph above the 'in June' paragraph talks about your call to the Columbia County Road Department. Who is Sherry?

        "A:  The young woman who answered the telephone.

        "Q:  Do you know Sherry?

        "A:  Never met her.

        "Q:  She identified herself as Sherry?

        "A:  Yes, she did.

---

        [3] In *Johnson*, the Supreme Court described the requisite knowledge of the identity of the tortfeasor as knowledge of "probable identity." 344 Or at 118 n 2. It is not clear if this test differs from knowledge of a "substantial possibility" that a particular person committed the tort. Any difference does not affect the analysis in this case.

"Q: What do you recall of your conversation with Sherry?

"A: I asked if they had done any roadside spraying in my area. I told her where. She put me on hold, came back on the phone after a few minutes and said, no, they had not. She indicated no spraying had been done out there for something like three years.

"Q: Your letter also says, 'She told me that's Jeff Peterson's job. He keeps spray locations in his timecards.'

"A: Yes.

"Q: So was there a suggestion that you contact Jeff Peterson?

"A: No. I never spoke to Jeff Peterson. I wouldn't know him if I saw him."

The letter referenced in that testimony is not part of the summary judgment record, and, without the letter itself, it is impossible to put the testimony in context. In fact, one plausible reading of Kathleen's testimony is that the county's phone operator put her on hold, checked with Peterson about his timecards, and reported back to Kathleen that the county had no record of spraying in her area. Another possibility is that Kathleen learned of Peterson's timecards sometime after her conversation with Sherry and included that information in her November letter; the letter does not specifically state that *Sherry told her* that Peterson keeps spray locations in his timecards. We can hardly conclude, as a matter of law, that plaintiffs should have inquired further of Peterson based on the scant evidence in the record concerning the exchange between Kathleen and the county's phone operator.

Next, the county argues that "plaintiffs' accusation to the State of Oregon Department of Agriculture on April 12, 2004, that the County may be a responsible party is *prima facie* evidence that plaintiffs knew there was a 'substantial possibility' the County was a culprit." We disagree. The report of loss indicates only that the county is a "[s]uspected cause" that "may be" responsible for the damage; it also states that the person who made the herbicide application is "[u]nknown." That evidence does not establish, as a matter of law, that plaintiffs knew of a "substantial possibility" that

the county was responsible for the damage to their property, particularly considering the evidence in the summary judgment record that the county previously denied spraying plaintiffs' area and keeping any records of such spraying.

In sum, we conclude that there are genuine issues of material fact in this record as to when plaintiffs became aware or should have become aware of a substantial possibility that the county was responsible for the damage to their property. Accordingly, the trial court erred in granting the county's motion for summary judgment on the ground that plaintiffs failed to provide timely notice of their claims.[4]

■ As noted above, however, the trial court also predicated its grant of summary judgment on plaintiffs' failure to create a genuine issue of material fact as to whether the county actually sprayed plaintiffs' property. In that regard, the court agreed with the county's argument that certain "undisputed" facts demonstrate as a matter of law that the county could not have been responsible for the damage. On appeal, the country reprises its argument that plaintiffs "ignore the undisputed physical facts." Those facts, more specifically, are (1) whatever was sprayed on plaintiffs' property killed large sections of grass in a wavelike pattern; (2) the product that was sprayed, Garlon 4, does not kill grass; and (3) the county's truck sprays only in a straight line rather than the wavelike pattern shown on the grass. Those "undisputed" facts are established solely by Peterson's own testimony and the "spray report" that he filled out.

We disagree with the county's underlying premise that plaintiffs were required to specifically refute Peterson's

---

[4] Plaintiffs also argue that their inverse condemnation claim was not subject to the 180-day notice requirement because it is a "self-executing" constitutional claim. Given our conclusion that there are issues of material fact that preclude summary judgment based on the notice issue, we need not address that argument. *But see Sells v. Nickerson*, 76 Or App 686, 691 n 4, 711 P2d 171 (1985), *rev den*, 300 Or 722 (1986) (citing *Suess Builders v. City of Beaverton*, 294 Or 254, 656 P2d 306 (1982), for the proposition that "ORS 30.275 does not apply to inverse condemnation actions"); *see also Vokoun v. City of Lake Oswego*, 189 Or App 499, 511, 76 P3d 677 (2003), *rev den*, 336 Or 406 (2004) (damage limitation in Oregon Tort Claims Act does not apply to inverse condemnation actions).

testimony to avoid summary judgment. ORCP 47 C author-
izes summary judgment only when no genuine issue as to a
material fact exists. That rule provides, in part:

> "No genuine issue as to a material fact exists if, based upon
> the record before the court viewed in a manner most favor-
> able to the adverse party, no objectively reasonable juror
> could return a verdict for the adverse party on the matter
> that is the subject of the motion for summary judgment.
> *The adverse party has the burden of producing evidence on
> any issue raised in the motion as to which the adverse party
> would have the burden of persuasion at trial.* The adverse
> party may satisfy the burden of producing evidence with an
> affidavit or a declaration under section E of this rule."

(Emphasis added.) Here, plaintiffs would have the burden of
persuasion at trial on the question whether the county
caused the damage to their property; accordingly, it is plain-
tiffs' burden on summary judgment to produce evidence in
support of their theory of causation. *See Davis v. County of
Clackamas*, 205 Or App 387, 394, 134 P3d 1090, *rev den*, 341
Or 244 (2006) (Where plaintiff had the burden of offering evi-
dence to create a genuine issue of material fact as to causa-
tion, "it is not enough for [the] plaintiff to impeach [a wit-
ness's] testimony. Rather, [the] plaintiff must offer
admissible evidence at the summary judgment stage that
creates a genuine issue of material fact as to causation.").

■      In our view, plaintiffs discharged their burden on the
issue of causation by producing evidence that (1) the county
sprayed plaintiffs' street with herbicide; (2) one of plaintiffs'
neighbors encouraged the county's employee, Peterson, to
spray "everything" on plaintiffs' property; (3) the county ini-
tially denied even spraying in plaintiffs' area;
(4) Peterson adjusted his sprayer to spray as far as it could
spray into the yard of one of plaintiffs' neighbors; and (5) the
damage to plaintiffs' property is consistent with herbicide
damage from a high-pressure sprayer. Viewing those facts in
the light most favorable to plaintiffs and drawing all reason-
able inferences in their favor, a reasonable juror could find
that Peterson either intentionally or accidentally sprayed
plaintiffs' property with herbicide, thereby causing damage
to the property. Thus, plaintiffs created a genuine issue of
material fact on the issue of causation regardless of

Peterson's testimony to the contrary. The jury, of course, would be entitled to find that Peterson is not credible, given his interest in the outcome of the litigation.[5]

This is not, as the county suggests, a case in which plaintiffs rely on "flat disbelief" to create a genuine issue of material fact. *Cf. Tolbert v. First National Bank*, 312 Or 485, 495, 823 P2d 965 (1991) ("[F]lat disbelief * * * is not an inference that plaintiffs may invoke on summary judgment[.]"). Rather, plaintiffs set forth facts that, when viewed in the light most favorable to them, establish an alternate version of what transpired on October 30, 2003, one that would allow the jury to find that the county sprayed plaintiffs' property and that whatever the county sprayed—Garlon 4 or otherwise—damaged their property, regardless of the county's evidence to the contrary. That is all that ORCP 47 C requires; accordingly, the trial court erred in concluding, as a matter of law, that plaintiffs had failed to create a genuine issue of material fact as to causation.[6]

■ We turn, then, to the trial court's determination that plaintiffs failed to state a claim for inverse condemnation. Plaintiffs' inverse condemnation claim is brought under Article I, section 18, of the Oregon Constitution, which provides that "[p]rivate property shall not be taken for public use * * * without just compensation[.]" In its motion for summary judgment, the county argued, in part, that plaintiffs had not alleged that their property had been taken "for public use" within the meaning of Article I, section 18. The trial court agreed with the county.

---

[5] We do not mean to suggest that Peterson's testimony *should* be disbelieved. Rather, the point is that a jury is always entitled to disbelieve a witness who has an interest in the outcome of the litigation. *See Hindman v. Coy*, 207 Or 279, 284, 295 P2d 1097 (1956) (the jury is the "sole judge of the credibility of the witnesses and of the weight of the evidence" and is "not required to believe the testimony of * * * the plaintiff or of any other witness"); *see also Fatehi v. Johnson*, 207 Or App 719, 730, 143 P3d 561, *rev den*, 342 Or 116 (2006) (jury entitled to disbelieve a witness "thought by the jury to have an interest in the outcome of the litigation"). If that is the case at trial, the burden should not be any higher for a plaintiff at the summary judgment stage.

[6] To require more, as plaintiffs point out, would make it virtually impossible to survive a motion for summary judgment in a case where the plaintiff must rely on circumstantial evidence because the defendant is the only witness to the tort.

In *Vokoun v. City of Lake Oswego*, 335 Or 19, 27, 56 P3d 396 (2002), the Supreme Court reaffirmed the long-standing principle that "a claim for inverse condemnation requires a showing that the governmental acts alleged to constitute a taking of private property were done with the intent to take the property for a public use." In that case, the City of Lake Oswego built a storm drain that ran underground along a drainage easement near the border of the plaintiffs' property. After a period of heavy rain, a landslide occurred on the hillside on which the plaintiffs' property was located. The plaintiffs then filed an action against the city for inverse condemnation and negligence. The inverse condemnation claim alleged that the city had taken their property for a public use by constructing a storm drain pipe and outfall pipe in a manner that destabilized the soils on and adjacent to the plaintiffs' property, thereby causing the landslide. The negligence claim alleged that the city had failed to inspect the erosion and prevent the landslide. The jury returned a verdict for the plaintiffs on both claims.

On appeal, the city argued that the trial court erred in refusing to grant its motion for a directed verdict on the inverse condemnation claim, because negligent interference with property rights does not support a claim for inverse condemnation. This court agreed and reversed the judgment. *Vokoun v. City of Lake Oswego*, 169 Or App 31, 7 P3d 608 (2000). Relying primarily on *Patterson v. Horsefly Irrigation Dist.*, 157 Or 1, 69 P2d 282, 70 P2d 36 (1937), we explained that the plaintiffs could recover on a theory of inverse condemnation "[o]nly if [the interference] is the natural and ordinary consequence of government action that was taken for public use * * *." We concluded:

> "If anything, [the interference with the plaintiffs' use of their property] was a consequence of the City failing properly to maintain and operate the drainage outfall. According to plaintiffs, had the City not acted negligently, the erosion would not have happened. Under *Patterson*, the erosion that resulted might be compensable in negligence, but it is not compensable under Article I, section 18."

*Vokoun*, 169 Or App at 40.

On review, the Supreme Court essentially agreed with our statement of the law, but it disagreed with our

application of the law to the particular facts in the case. Initially, the court rejected the plaintiffs' suggestion that two Supreme Court cases, *Morisson v. Clackamas County,* 141 Or 564, 18 P2d 814 (1933), and *Tomasek v. Oregon Highway Com'n,* 196 Or 120, 248 P2d 703 (1952), had "eliminated the requirement that a claim for inverse condemnation requires a showing that the governmental defendant intended to take private property for a public use." 335 Or at 27-28. The court explained that *Morrison,* which involved the county's construction of a jetty that diverted water, and *Tomasek,* which arose out of the state highway department's construction of a roadbed and bridge that closed off a waterway, retained the requirement in inverse condemnation cases that a governmental defendant intend to take private property for a public use. What those cases stand for, rather, is the proposition that "[a] factfinder may infer the intent to take from the governmental defendant's action if * * * the natural and ordinary consequence of that action was the substantial interference with property rights." 335 Or at 29.

The court then applied that principle to the facts in *Vokoun.* The court explained:

"The city built the storm drain, and it is undisputed that a storm drain is a public work, serving a public purpose. Before the storm drain was built, there was no natural drainage course in the ravine. The storm drain collected more than five times the amount of water that naturally flowed through the area where the landslide occurred. The outfall pipe dispersed that water with such force that the water carved a drainage course along the ravine. The water was directed at, and caused, unnatural erosion along the drainage course, undermining the toe of the slope that supported the hillside on which plaintiffs' property is located. *One reasonable inference from the foregoing evidence is that the landslide was the natural and ordinary (even inevitable) consequence of the city's construction of the storm drain in that manner. It follows that there is evidence in the record to support the jury's verdict.*"

*Id.* at 30 (emphasis added).

The question in this case is similar to that in *Vokoun:* Have plaintiffs pleaded facts from which a juror could find that the governmental defendant intended to take

their property for a public use? And, as in *Vokoun*, the question further reduces to whether plaintiffs have alleged facts from which a juror could find that the damage to their property was a "natural and ordinary consequence" of the county's action.

Plaintiffs' complaint sets forth two alternative theories of what transpired in October 2003: (1) Peterson, in the course of spraying the roadside ditches, accidentally sprayed herbicide "as high as 15 feet into trees on Plaintiffs' property line, and up to 30 vertical feet onto Plaintiffs' property"; or (2) Peterson intentionally sprayed herbicide into plaintiffs' yard. Neither circumstance, however, gives rise to an inference that the county intended to take plaintiffs' property for a public use.

Unlike the facts in *Vokoun*, *Tomasek*, and *Morrison*—cases in which property damage resulted as a natural and ordinary consequence of the government defendant's construction of a project for public use—nothing about an accidental spraying gives rise to the inference that the county intended to take plaintiffs' property. Plaintiffs have not alleged (or offered any evidence) that a county spray program for roadside ditches would naturally and ordinarily cause damage to plaintiffs' property in particular, or, for that matter, that the spray program, properly carried out, would naturally or ordinarily cause damage to *any* property. In fact, plaintiffs' theory is that, had the county not performed those spray operations in a negligent manner, plaintiffs' property would not have been harmed. Those allegations are materially different from—and do not give rise to the same inferences of intent as—allegations that the county designed and carried out a project for public use that would damage their property as a natural and ordinary consequence of the project.

Plaintiffs' alternative theory—that Peterson intentionally sprayed plaintiffs' property—is even less susceptible to an inference that the county intended to take plaintiffs' property for a public use. On the facts of this case, no reasonable juror could conclude that a county employee who intentionally and maliciously sprays herbicide onto private property is acting "for a public use." Nor could a reasonable juror

conclude that such an intentional act is a "natural and ordinary consequence" of the county's spray program. For that reason and the others stated above, we agree with the trial court's ruling that plaintiffs failed to state a claim for inverse condemnation, because the alleged government acts were not "for public use" as required by Article I, section 18.

■       We turn, finally, to the trial court's conclusion that plaintiffs failed to state a claim for timber trespass under ORS 105.810. ORS 105.810(1) provides, in part:

> "[W]henever any person, without lawful authority, *willfully injures or severs from the land of another any produce thereof or cuts down, girdles or otherwise injures or carries off any tree, timber or shrub on the land of another person* * * *, in an action by such person * * * against the person committing such trespasses if judgment is given for the plaintiff, it shall be given for treble the amount of damages claimed, or assessed for the trespass. In any such action, upon plaintiff's proof of ownership of the premises and the commission by the defendant of any of the acts mentioned in this section, it is prima facie evidence that the acts were committed by the defendant willfully, intentionally and without plaintiff's consent."

(Emphasis added.)

Plaintiffs' claim for timber trespass alleges that the county's employee willfully injured their trees—allegations that state a claim for timber trespass under the plain language of ORS 105.810(1). Nonetheless, the county argued below that two Supreme Court cases, *Meyer v. Harvey Aluminum*, 263 Or 487, 501 P2d 795 (1972), and *Chase v. Henderson*, 265 Or 431, 509 P2d 1188 (1973), hold that damages from injuries caused by chemical spray are not within the scope of the timber trespass statute and therefore bar plaintiffs' claim. The trial court apparently agreed with the county's reading of those two cases.

On appeal, the county again relies on *Meyer* and *Chase*, although it now concedes that "the case law in this area is exceedingly sparse[.]" *Meyer* involved a timber trespass claim for injuries to fruit crops and trees caused by emissions from the defendants' aluminum plant. The jury awarded the plaintiffs their actual damages, and the trial court then trebled that award pursuant to ORS 105.810. The Supreme Court reversed, concluding that ORS 105.810 did

not "apply to the kind of damages assessed in the instant case." *Meyer*, 263 Or at 498-99.

As we have previously remarked, the "basis of the court's holding [in *Meyer*] is somewhat uncertain." *Wyatt v. Sweitz*, 146 Or App 723, 729 n 10, 934 P2d 544, *rev dismissed*, 326 Or 63 (1997). The opinion in *Meyer* begins by framing the issue as "whether these statutes [ORS 105.810 and ORS 105.815, the double-damages timber trespass statutes] apply to injuries to [the] plaintiffs' fruit crops and trees caused by fumes emitted from [the] defendants' plant." 263 Or at 496. The court then explains that the timber trespass statutes have been part of Oregon law since Deady's codification and that "the most significant amendment" in 1925 added the words "produce" and "injury" to the treble damages statute:

> "The amendment of 1925, adding 'produce' seems to indicate that the statute was not to be limited to the injuring of trees. *The use of 'injury' as well as 'cut' or 'sever,' etc., seems to indicate that the statute applies although the damage is inflicted in ways other than cutting.*"

*Id*. at 496-97 (emphasis added).

At that point in the opinion, it becomes difficult to discern what language in ORS 105.810 the court is actually construing. In the paragraph that follows the discussion of the 1925 amendment, the court observes that its "decisions construing these statutes have always involved the cutting of timber." *Id.* at 497. Two previous cases under the statutes, the court notes, have involved injuries other than cutting timber, but in both instances, the applicability of the statute was not properly at issue. *Id.* (citing *Brown v. Johnston*, 258 Or 284, 482 P2d 712 (1971), and *Cross v. Harris*, 230 Or 398, 370 P2d 703 (1962)).[7]

---

[7] The opinion also includes a paragraph describing "one of the early fume cases in Oregon seeking damages for the destruction of crops and trees[.]" *Meyer*, 263 Or at 497. In that unreported decision from federal district court,

"United States District Judge James Alger Fee, held: 'There is, however, no basis for the allowance of treble damages under the Oregon statute, since the language shows the enactment covers only deliberate trespass such as involved in cutting standing timber.' *Kerr v. Reynolds Metal Company* (December 11, 1955, US Dist Ct D Or unreported)."

*Id.*

The next two paragraphs of the court's analysis focus on the purposes of ORS 105.810. In that regard, the court first observes:

> "One purpose of the treble damage statute is to deter the cutting of another person's timber. *Kinzua Lbr. Co. v. Daggett*, 203 Or 585, 591-92, 281 P2d 221 (1955). The destruction of fruit and fruit trees by fumes might also be deterred by the assessment of treble damages."

*Meyer*, 263 Or at 498. Another purpose of the multiple damages statutes, the court explains, is to prevent a trespasser from effectively forcing the owner to sell his or her timber at market value; if a trespasser is required to pay only actual damages, someone who needs timber could simply trespass and then pay market value for the timber. *Id*. That purpose, the court summarily concludes, "is applicable to timber trespass but not to injury of fruit and fruit trees." *Id*.

In the penultimate paragraph of its analysis, the court observes that "[s]ome of the distinctions that the multiple damages statutes make between the circumstances when treble damages may be assessed and when only double damages can be assessed cannot be made applicable to the instant case." *Id*. The court's reasoning in that paragraph appears to be that, because some language in the *double damages* statute cannot be made applicable to damages for injuries to fruit crops and trees from chemical drift, the treble damages statute should not apply to those damages either. *Id*.

The court then offered the following summation of its analysis of ORS 105.810: "Based upon the litigation history of this treble damage statute and the total scheme of the multiple damage statutes, *we conclude that they do not apply to the kind of damages assessed in the instant case*." *Id*. at 498-99 (emphasis added).

Seven months after *Meyer*, the court issued its opinion in *Chase*. That case involved damages to a bean crop allegedly caused by chemical drift from a helicopter spraying a nearby pasture. The trial court doubled the jury's award of damages based on ORS 105.815. On appeal, the defendant

contended that the double damages statute was not applicable. The court agreed, based on its decision in *Meyer*:

"After the trial in this case we decided [*Meyer*]. We held ORS 105.810, the companion statute to ORS 105.815, did not permit the trebling of damages. In that case the plaintiffs' fruit crop and trees were allegedly damaged by emissions from the defendant's aluminum plant. *The same considerations which caused us to conclude that treble damages were not allowable in such a case cause us to conclude that double damages are not allowable in this case.*"

*Chase*, 265 Or at 432 (emphasis added).

According to the county, *Meyer* and *Chase* "held that the purpose of the treble damage statute and total scheme of multiple damages statutes do not apply to damage caused by chemicals," and "the relevant language of the timber trespass statutes has remained virtually unchanged." Frankly, if *Meyer* wrote something into the timber trespass statutes, we cannot tell what it was. At most, *Meyer* appears to stand for the proposition that damages for injuries to fruit crops and trees resulting from chemical drift are not the type of damages that are trebled under ORS 105.810. Given our uncertainty regarding the basis for the court's holding—and the fact that a more expansive holding would conflict with the plain and unambiguous language of the statute—we decline to read *Meyer* as broadly as the county suggests. *Cf. State v. Sandoval*, 342 Or 506, 512-13, 156 P3d 60 (2007) (declining to apply pre-*PGE* case law concerning a duty of retreat where analytical flow of prior opinion was "distinctly odd" and was not grounded in the text of the controlling statutes). Instead, we understand *Meyer* to permit the application of ORS 105.810 to the direct spraying of herbicide on trees and shrubs—conduct that is a "deliberate trespass such as involved in cutting standing timber." 263 Or at 497 (internal quotation marks omitted).

In short, plaintiffs' timber trespass claim alleges that a county employee willfully injured their trees and shrubs by spraying herbicide directly onto their property. That type of injury falls squarely within the scope of ORS 105.810, and the trial court erred in concluding otherwise.

Reversed and remanded on claims for negligence and timber trespass; otherwise affirmed.